UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ALICE PECK DAY MEMORIAL HOSPITAL, THE CHESHIRE MEDICAL CENTER, and VALLEY REGIONAL HOSPITAL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL SMITH, in his official capacity as the Secretary of the Vermont Agency of Human Services, STATE OF VERMONT AGENCY OF HUMAN SERVICES, ALEX AZAR, in his official capacity as Secretary of the United States Department of Health and Human Services, SEEMA VERMA, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services, and CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendants. | CIVIL ACTION No. 2:21-cv-00102 |

**STATE DEFENDANTS' PARTIAL MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

Defendants State of Vermont Agency of Human Services and its Secretary, Michael Smith ("Vermont Defendants" or "State Defendants"), move this Court to dismiss Counts I and II for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). In support of this motion, Vermont Defendants submit the following incorporated memorandum of law.

**MEMORANDUM OF LAW IN SUPPORT OF
STATE DEFENDANTS' PARTIAL MOTION TO DISMISS**

Plaintiffs challenge State Defendants' policies and practices related to the administration of Vermont's Medicaid program. Plaintiffs are hospitals located in New Hampshire that provide services to Vermont Medicaid recipients due to their proximity to Vermont's border.  Against the

State Defendants, Plaintiffs allege violations of the Fourteenth Amendment's Equal Protection Clause and the Commerce Clause. Plaintiffs fail to state a claim for relief under either of these provisions. The Equal Protection claim fails because Plaintiffs fail to allege that there is no conceivable legitimate basis for the State's actions. The Commerce Clause claim fails on multiple grounds. First, Congress has explicitly authorized the actions of which Plaintiff complains, thus there can be no Commerce Clause violation. Within the area Congress authorized, the State is promoting the health of its citizens as opposed to engaging in economic protectionism. Moreover, interstate commerce is not unduly burdened by the reimbursement rates because Plaintiffs benefit from not paying Vermont's provider tax. Finally, the State is acting as a market participant and is thereby exempt from Commerce Clause restrictions.

## Factual and Procedural Background

### I.      Medicaid's Statutory Framework

#### A.  Federal Law

Congress established the Medicaid program in 1965 by adding it to the Social Security Act. *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 (2003). "Like other Spending Clause legislation, Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 323 (2015). Medicaid "authorizes federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Pharm. Rsch. & Mfrs. of Am*. 538 U.S. at 650; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 541 (2012) ("Medicaid offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care."); *Harris v. McRae*, 448 U.S. 297, 301 (1980). "By 1982 every State

had chosen to participate in Medicaid. Federal funds received through the Medicaid program have become a substantial part of state budgets, now constituting over 10 percent of most States' total revenue." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 542.

To participate, a State must adopt a plan that is approved by the Secretary of Health and Human Services. *See* 42 U.S.C. § 1396a(b). The requirements for a state plan are extensive and detailed, including categories of eligible beneficiaries, procedures for determining payment rates, specific kinds of medical services covered, and the scope of services available to beneficiaries. *See* § § 1396a(a)(10), (13), (17), (30). There are a total of eighty-seven requirements enumerated in § 1396a.

Though states are obligated to maintain an adequate provider network, individual providers are under no obligation to participate in Medicaid or to provide non-emergency services to beneficiaries. *Cf. Asante v. California Dep't of Health Care Servs.,* 886 F.3d 795, 801 (9th Cir. 2018) ("[T]he Hospitals are not required to participate in the [California Medicaid] insurance program; no hospital is."). If a provider does choose to participate in a state's Medicaid program, it must execute a provider agreement. *See* 42 U.S.C. §§ 1396a(a)(27), 1396b(m)(2)(A)(iii).

States may apply to the Secretary of the United States Department of Health and Human Services ("HHS") for a waiver from the § 1396a requirements. *See* 42 U.S.C. § 1315. Commonly referred to as Section 1115 waivers, they are intended to allow states to develop demonstration projects that promote Medicaid's policy objectives of providing healthcare to needy persons with new or different approaches to the efficient and cost effective delivery of healthcare services. *See e.g., Philbrick v. Azar*, 397 F. Supp. 3d 11, 17 (D.D.C. 2019), aff'd, No. 19-5293, 2020 WL 2621222 (D.C. Cir. May 20, 2020), cert. granted sub nom. *Azar v. Gresham*,

141 S. Ct. 890 (2020) (invalidating New Hampshire's 1115 waiver which imposed a work requirement on Medicaid beneficiaries as part of the implementation of the Affordable Care Act).

With an approved plan or 1115 waiver in place, a state is eligible to receive federal financial assistance. *See* 42 U.S.C. § 1396d; 42 C.F.R. § 430.30(a)(1). The Federal medical assistance percentage ("FMAP") varies by state and can range from 50% to 83% of a state's Medicaid expenditures. 42 U.S.C. § 1396d(b). CMS issues a quarterly grant to a state as a reimbursement based upon its actual expenditures. *See id.* 42 C.F.R. § 430.30(c). "[T]hough generally discussed in terms of an 'entitlement' program, the scope and extent of Medicaid benefits are directly dependent upon a state's ability to raise the revenue necessary to pay the first dollars of any benefit; only after a state has paid for its Medicaid program is it then entitled by federal law to the matching federal dollars." Jennifer L. Herbst et. al., *Hospital Taxes, Medicaid Supplemental Payments, and State Budgets*, 40 J. LEGAL MED. 135, 139 (2020).

State revenue for Medicaid programs can come from a variety of sources. One source Congress has authorized is a health care tax. *See* 42 U.S.C. § 1396b(w). A health care tax, or provider tax, must be broad-based, i.e., uniformly applied, and not contain a hold harmless provision. *See* § 1396b(w)(1)(A)(ii)(iii) & (4). A "hold harmless provision" provides a payment from the state to the taxpayer that is tied to the amount of the health related tax paid. *See* § 1396b(w)(4). There are several ways a tax may violate the prohibition on a hold harmless provision: 1) if it provides direct payments to the taxpayer based on the amount of the tax paid or the difference between the amount of the tax paid and the amount the taxpayer receives as payments under the state's Medicaid plan; 2) if payments that the taxpayer receives under the state's Medicaid program are tied to the total tax paid, or 3) if a state promises to hold the

taxpayer harmless for a portion of the cost of the tax through a direct payment from the state or an exemption from the tax. *See* § 1396b(w)(4)(A), (B) & (C).  If a provider tax is not broad-based, or contains a hold harmless provision, the revenues generated may not be used to obtain federal matching funds.

### B.  Vermont's Medicaid Program

Since 2005, Vermont has implemented its Medicaid program through the Global Commitment to Health Section 1115 Demonstration.[1]  The Global Commitment to Health is designed to "use a multi-disciplinary approach including basic principles of public health, the fundamentals of effective administration of a Medicaid managed care delivery system, public-private partnership, and program flexibility."  *See* Waiver, p. 9.  The parties to the agreement are the Vermont Agency of Human Services ("AHS") and the Centers for Medicare & Medicaid Services ("CMS").  *See id.*, p. 8.  Vermont statute mirrors the terms of the Waiver by authorizing the Secretary of Human Services to take appropriate action to administer a Medicaid program in compliance with 42 U.S.C. § 1396 *et seq.* or to seek a waiver therefrom.  33 V.S.A. § 1901(a)(1, 2).

The primary goal of the Global Commitment to Health is to improve the health status of all Vermonters by:

---

[1] Vermont's current 1115 Waiver ("Waiver") is available at: https://humanservices.vermont.gov/sites/ahsnew/files/documents/MedicaidPolicy/GC1115Waiver/VT-GCH-STCs-IMD-Phasedown-Approval-01-13-2021.pdf.  The Waiver is incorporated by reference into the Complaint as the legal authority by which the reimbursement rates Plaintiffs complain of were promulgated.  In the alternative, the Court may take judicial notice of the Waiver as a public filing.  A district court is permitted to consider public filings in deciding a motion to dismiss.  *See Negrito v. Buonaugurio*, 836 F. App'x 36, 38 (2d Cir. 2020); *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) ("Judicial notice may be taken of public filings...."); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (on a motion to dismiss, a court may consider "matters of which judicial notice may be taken").

- Promoting delivery system reform through value based payment models and alignment across public payers;
- Increasing access to affordable and high quality health care by assisting lower-income individuals who can qualify for private insurance through the Marketplace;
- Improving access to primary care;
- Improving health care delivery for individuals with chronic care needs; and
- Allowing beneficiaries a choice in long-term services and supports and providing an array of home and community-based alternatives recognized to be more cost-effective than institutional based supports.

Waiver at pp. 10-11. In achieving these goals, AHS has entered into an agreement with the Vermont Department of Health Access ("DVHA"), a subdivision of AHS, to deliver services to beneficiaries through a managed care-like model that meets the requirements of a non-risk pre-paid inpatient health plan ("PIHP"). *See id*. p. 11. In administering the program, DVHA sets the reimbursement rates for providers, without regard to the payment provisions in the approved state plan. *See id*., p. 2. The Waiver allows DVHA to establish reimbursement rates for providers "on an individual or class basis without regard to the rates currently set forth in the approved state plan." *Id*., p. 2.

In addition to a waiver of programmatic requirements, Vermont also has a waiver allowing expenditures made through the Global Commitment to Health to be regarded as expenditures under the State's Medicaid plan so that they qualify for receipt of federal financial participation ("FFP"). *See* Waiver, p. 4. Part of Vermont's Medicaid financing comes from a provider tax, the proceeds of which are expressly intended to be eligible for federal financial participation. *See* 33 V.S.A. § 1950(a) ("The purpose of this subchapter is to establish assessments on health care providers, which funds shall be used in the State's health care program in such a way as to be eligible for federal financial participation."). The AHS Secretary and the DVHA Commissioner are statutorily bound to "interpret and administer the provisions of [the provider tax statute] so as to maximize federal financial participation and avoid

disallowances of federal financial participation." § 1950(b). All Vermont hospitals, regardless of their participation in the Global Commitment to Health, are assessed six percent of their net patient revenues. *See* 33 V.S.A. § 1953(a)(1). As with any state Medicaid program, providers who wish to participate in Vermont Medicaid must execute a contract with DVHA—currently, a standard General Provider Agreement. *See* DVHA General Provider Agreement, http://www.vtmedicaid.com/assets/provEnroll/General_Provider_Agreement.pdf (current version of General Provider Agreement).

## II.    The Plaintiffs

Plaintiffs are hospitals that provide care to Vermont Medicaid beneficiaries primarily due to their location near the border between Vermont and New Hampshire. Complaint, ¶ 1. Each Plaintiff has, accordingly, entered into a General Provider Agreement with DVHA. *See Alice Peck Day Mem. Hosp. v. Vt. Agency of Human Servs.*, No. 20-CV-919-LM, 2021 WL 736146, at *4 (D.N.H. Feb. 25, 2021). Two of the Plaintiffs, Alice Peck Day Hospital ("APD") and Cheshire Medical Center ("Cheshire") are members of the Dartmouth-Hitchcock Health ("D-HH") System. *Id*. ¶ 9, 10. APD operates a twenty-five bed facility in Lebanon, New Hampshire, *id*. ¶ 9, approximately four and one-half miles from Dartmouth Hitchcock Medical Center. It has been a member of the D-HH System since 2016. *Id*. APD reported $74,909,011.00 in gross receipts and $28,448,807.00 in net assets on its 2018 Form 990 filed with the Internal Revenue Service. *See* Attachment A.[2] APD alleges that the reimbursement rates at issue result in an

---

[2] A district court is permitted to consider public filings in deciding a motion to dismiss. *See Negrito v. Buonaugurio*, 836 F. App'x 36, 38 (2d Cir. 2020); *Kavowras v. N.Y. Times Co*., 328 F.3d 50, 57 (2d Cir. 2003) ("Judicial notice may be taken of public filings...."); *Brass v. American Film Technologies, Inc*., 987 F.2d 142, 150 (2d Cir. 1993) (on a motion to dismiss, a court may consider "matters of which judicial notice may be taken"). An IRS Form 990 is a public filing and available through the IRS website. *See* https://apps.irs.gov/app/eos/ for the IRS Tax Exempt Organization Search Tool which provides public access to Form 990s.

annual shortfall of more than $500,000.00 for inpatient care and $200,000.00 for outpatient care. Complaint, ¶ 35. 41. This equals approximately 0.9% of APD's gross receipts.

Cheshire operates a facility with one hundred and sixty-nine beds in Keene, New Hampshire. *Id*. ¶ 10. It has been a member of the D-HH system since 2015. *Id*. Cheshire reported $227,976,248.00 in gross receipts and $72,238,083.00 in net assets on its 2018 Form 990. *See* Attachment B. Cheshire alleges that the reimbursement rates at issue result in an annual shortfall of $575,000.00 for inpatient treatment and $80,000.00 for outpatient treatment. Complaint, ¶ 58, 63. This equals approximately 0.2% of Cheshire's gross receipts.

Valley Regional Hospital ("VRH") operates a twenty-five bed facility in Claremont, New Hampshire. Complaint, ¶ 11. VRH reported $47,381,298.00 in gross receipts and $27,501,341.00 in net assets on its 2018 Form 990. *See* Attachment C. VRH alleges an annual shortfall of $37,000.00 for inpatient treatment and $70,000.00 for outpatient treatment. Complaint, ¶ 36, 41. This equals approximately 0.2% of VRH's gross receipts.

## III.    Plaintiffs' Complaint

The Complaint contains five counts, only two of which are against the State Defendants and addressed in this motion. Count I is a claim under 42 U.S.C. § 1983 for an alleged violation of Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause. Count II is also a § 1983 claim and alleges a violation of the dormant Commerce Clause. The alleged violation of law in each count arises from three different reimbursement rates that apply to each Plaintiff, inpatient care, outlier payments for inpatient care[3], and outpatient care.

---

[3] Outlier payments compensate individual providers when the cost of inpatient care for an individual exceeds a predetermined value representing the cost of the expected care for an average patient with a similar condition.

Plaintiffs allege that the reimbursement rates at issue are "unfair" and "potentially threatens the sustainability" of their continuing treatment of Vermont Medicaid beneficiaries. Complaint, ¶ 38.  The exhibits attached to the Complaint are promulgated by DVHA pursuant to Vermont's 1115 waiver.[4]

Plaintiffs seek declaratory and injunctive relief requiring the State Defendants to treat them no differently from allegedly similarly situated in-state hospitals.

## IV.    Procedural History

Plaintiffs originally filed this action in the District of New Hampshire. State Defendants moved to transfer venue to this District pursuant to the forum selection clause in the General Provider Agreement signed by each Plaintiff, article 5.5. Plaintiffs opposed transfer, arguing that their claims did not arise under the General Provider Agreement. In a thirteen-page opinion, the New Hampshire District Court found that "Plaintiffs' claims arise from the [General Provider] Agreements" and transferred venue to this District. *Alice Peck Day Mem. Hosp.*, 2021 WL 736146, at *4.

## Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) "assume[s] the truth of a pleading's factual allegations and test[s] only its legal sufficiency."  *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000).  However, to survive a motion to dismiss, a plaintiff must plead sufficient facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Old St. George's*

---

[4] The history of amendments to the reimbursement policies, and the legal authority therefore, are available through Vermont's Global Commitment Registry public notices.  *See* https://humanservices.vermont.gov/about-us/medicaid-administration/global-commitment-register/final-policies.  As public notices on a state government website, the Court can take judicial notice of these documents.  *See 23-34 94th St. Grocery Corp. v. N.Y. City Bd. Of Health*, 685 F.3d 174, 183, n. 7 (2d Cir. 2012); *see* n. 3, supra.

*L.L.C. v. Bianco*, 389 Fed. App'x 33, 35 (2d Cir. 2010) (dismissing First Amendment claim brought pursuant to § 1983 for failure to state a claim). "[T]he tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." *Wood v. Applied Research Assocs., Inc.*, 328 Fed. App'x 744, 747 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 677-80); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

"A written instrument that is incorporated in the complaint by reference is deemed part of the complaint and thus may properly be considered by the district court in ruling on a Rule 12(b)(6) motion. Further, 'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim.'" *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 120 (2d Cir. 2020) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) and citing, *inter alia*, 5 C. Wright & A. Miller, Fed. Prac. & Proc. § 1327 (4th ed. 2002)).

### Argument

**I.      The Equal Protection Clause Claim Should Be Dismissed Because there is a Rational Basis for the Challenged Rates that Furthers Vermont Medicaid Beneficiaries' Interests.**

Plaintiffs allege that several reimbursement rates DVHA established violate the Fourteenth Amendment's Equal Protection Clause because they are "similarly situated to comparable, in-state Vermont hospitals and provide comparable services" yet are not compensated equally.  Complaint ¶79.  Plaintiffs concede that their claim is not premised on a suspect classification.  *Id*. ¶ 77.  Rather, the rates allegedly discriminate solely on the basis that Plaintiffs are not located in Vermont.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *A.M. v. French*, 431 F. Supp. 3d 432, 446 (D. Vt. 2019) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). In the absence of a protected class, "measures 'must be upheld against equal protection challenge if there is any reasonable conceivable state of facts that could provide a basis for the classification.' Indeed, that a federal court is empowered to entertain an equal protection claim 'is not a license ... to judge the wisdom, fairness, or logic of legislative choices.'" *In re NYAHSA Litig.*, 318 F. Supp. 2d 30, 41–42 (N.D.N.Y. 2004), aff'd sub nom. *New York Ass'n of Homes & Servs. for the Aging, Inc. v. DeBuono*, 444 F.3d 147 (2d Cir. 2006) (quoting *Connolly v. McCall*, 254 F.3d 36, 42 (2d Cir. 2001) (per curiam) (internal quotations and citation omitted); *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). "To withstand a motion to dismiss such a claim, a plaintiff must plead sufficient facts that, treated as true, overcome the presumption of rationality that applies to government classifications." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49–50 (2d Cir. 2018).

"[I]t is very difficult to overcome the strong presumption of rationality that attaches to a statute. … To succeed on a claim such as this, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (*citing Vance v. Bradley*, 440 U.S. 93, 97 (1979)). "A court is not confined to the particular rational or irrational purposes that may have been raised in the pleadings." *Progressive Credit Union*, 889 F.3d at 49–50. Indeed, a court may

hypothesize a legitimate rational governmental purpose when deciding an equal protection claim on a motion to dismiss. *Johnson v. Baker*, 108 F.3d 10, 11-12 (2d Cir. 1997); *A.M. by & through Messineo*, 431 F. Supp. 3d at 447 ("[T]he court may consider any conceivable government purpose for a classification and is not limited to those purposes identified by the parties."). Preserving the financial integrity of welfare programs is a legitimate state interest. *In re NYAHSA Litig.*, 318 F. Supp. 2d at 42 (citing *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (discussing a state's broad discretion in financing Medicaid benefits)); *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (upholding cost-saving measure that reduced Medicaid benefits).

In a "class of one" equal protection claim, i.e., in the absence of a suspect class, "plaintiffs 'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Progressive Credit Union*, 889 F.3d at 49 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). Indeed, plaintiffs must be "prima facie identical" to the comparators. *See id.* (citing *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)). Such a high degree of similarity allows an inference that the alleged discriminatory treatment "lacks any reasonable nexus with a legitimate governmental policy." *Id.* (citation omitted). "Courts require 'more than a bare allegation that other individuals were treated differently.' [T]he court must [ ] determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Killoran v. Westhampton Beach Sch. Dist.*, No. 19-CV-6663(JS)(SIL), 2021 WL 1146078, at *5 (E.D.N.Y. Mar. 25, 2021) (quoting *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 434-5 (S.D.N.Y. 2013) (citation omitted)).

Here, Plaintiffs allege that they are each a "high-volume provider" of medical services to Vermont Medicaid enrollees, and provide a similar "level of care and services" as their Vermont counterparts. Complaint ¶ 1, 3.  In providing these services, each Plaintiff allegedly "incur[s] similar costs and expend[s] similar resources as Vermont's comparatively-sized and similarly-situated in-state hospitals."  *Id.* ¶ 1.  The Complaint further alleges that APD and VRH each treat "a large number of Vermont Medicaid and uninsured patients and incur uncompensated care costs in doing so." *Id.* ¶ 26.  Both APD and Cheshire are members of the Dartmouth-Hitchcock Health System ("D-HH") and have been for several years.  *Id.* ¶ 9, 10.  Beyond these allegations, the Complaint alleges, in conclusory fashion, that the only relevant difference between Plaintiffs and Vermont hospitals is their out-of-state location.  *Id.* ¶ 52.

Beyond these generic qualities, the Complaint is devoid of the type of factual similarities that would amount to the prima facie showing necessary to adequately allege a class of one claim.  There are no allegations about the cost of operating a hospital in New Hampshire as compared to Vermont.  There are no allegations that establish New Hampshire's regulatory system is the same as Vermont's.  Most importantly, Plaintiffs do not allege that they are subject to the same statutory and regulatory environment as Vermont hospitals.  Though Plaintiffs do allege that they are regulated by AHS by participating in Vermont's Medicaid system, their participation is voluntary.  Any "regulation" they refer to arises out of their contractual duties as a participating provider.

Complying with Medicaid requirements is only one piece of the regulatory environment in which hospitals function in Vermont.  Vermont Hospitals are subject to regulation through the Green Mountain Care Board ("GMCB"), 18 V.S.A. § 9374, which does not, and cannot, regulate

Plaintiffs.  Thus, Plaintiffs are free from reporting requirements and other forms of oversight that would otherwise have a direct impact on their operating costs.

A more significant difference also prevents Plaintiffs from being "prima facie identical" to their Vermont counterparts.  Since Plaintiffs do not operate in Vermont, they do not pay the provider tax required of all Vermont hospitals.  *See* 33 V.S.A. § 1950, *et seq*.  Hospitals subject to Vermont's provider tax are assessed 6% of their net patient revenues.  *See* § 1953(a)(1).  In accordance with federal statute, Vermont's provider tax is broad-based, does not contain a hold harmless provision, and is used to fund the state contribution to Vermont Medicaid.

The provider tax determines, to a significant extent, the amount of federal financial participation ("FFP") in Vermont's program.  Since Plaintiffs do not contribute to the State funds that qualify for matching FFP, paying them the same rates as Vermont hospitals would siphon critical funding out of Vermont's system and undermine the goals of the Global Commitment to Health Waiver.  In fact, if Plaintiffs received the same rates as Vermont hospitals, it would amount to a windfall.  This fundamental difference between Plaintiffs and Vermont hospitals not only eliminates the alleged similarities, it provides a rational basis for treating them differently.

Because Plaintiffs do not, and cannot, demonstrate an extremely high degree of similarity between themselves and Vermont hospitals, and do not fully participate in Vermont's healthcare system in the same manner as hospitals located within the State, their equal protection claim should be dismissed.

## II.    Count II Should Be Dismissed Because Congress Granted the States Broad Authority to Implement State Medicaid Programs, Eliminating Commerce Clause Concerns.

The Commerce Clause gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.  The so-called "dormant" Commerce Clause, "which

the Supreme Court has inferred from the text of the clause, prevents a state from enacting regulations that discriminate against out-of-state entities or burden interstate commerce." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 624 (5th Cir. 2010) (citing *Granholm v. Heald*, 544 U.S. 460, 472 (2005)). "Although the Commerce Clause is written as an affirmative grant of authority to Congress, [the U.S. Supreme Court] has long held that in some instances it imposes limitations on the States absent congressional action. Of course, when Congress exercises its power to regulate commerce by enacting legislation, the legislation controls." *S. Dakota v. Wayfair, Inc*., 138 S. Ct. 2080, 2089–90 (2018) (citation omitted); *see New England Power Co. v. New Hampshire*, 455 U.S. 331, 339–40 (1982) ("It is indeed well settled that Congress may use its powers under the Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.'") (citation omitted); *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 769 (1945) ("Congress has undoubted power to redefine the distribution of power over interstate commerce. It may … permit the states to regulate the commerce in a manner which would otherwise not be permissible…") (collecting cases). In sum, where Congress has acted, a Commerce Clause claim cannot stand.

In addition, the nature of state action at issue may indicate a different balance of federal/state power. "For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulation, on the other." *Sporhase v. Nebraska*, 458 U.S. 941, 956 (1982) (citing *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 533 (1949)). A state may exert power over interstate commerce in order "to shelter its people from menaces to their health or safety and from fraud" whereas States lack "power to retard, burden or constrict the flow of [interstate] commerce for their economic advantage." *H. P. Hood & Sons, Inc*., 336 U.S. at 533. A state's power over the health and

safety of its citizens, even where interstate commerce is implicated, "is one deeply rooted in both our history and our law."  *Id.*; *Maine v. Taylor*, 477 U.S. 131, 138 (1986) ("[T]he States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected.") (quoting *Lewis v. BT Investment Managers, Inc*., 447 U.S. 27, 36 (1980)).

For a state action to be immune from the effect of the Dormant Commerce Clause, Congress must make its intent "unmistakably clear."  *Am. Trucking Associations, Inc. v. New York State Thruway Auth.*, 886 F.3d 238, 245 (2d Cir. 2018).  "In other words, Congress need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the Dormant Commerce Clause; it need only clearly allow the state to engage in such activity."  *Id*.

Here, Congress has clearly allowed states to set provider reimbursement rates in a manner that would otherwise violate the Dormant Commerce Clause by authorizing States to design, administer and finance their own healthcare systems for state residents who could otherwise not afford healthcare.  Congress designed the program to be implemented by each State individually, for the benefit of that State's needy residents.  42 U.S.C. §§ 1396a(a)(1), (16). Congress clearly intended to provide federal financial assistance to States to reimburse costs of medical treatment for needy persons.  *Harris*, 448 U.S. at 301; *Alexander v. Choate*, 469 U.S. 287, 290 n.1 (1985) (noting that Congress intended to provide Federal subsidies for state plans for the funding of medical services for the needy).  "The [Medicaid] Act gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in the 'best interests of the recipients.'"  *Alexander*, 469 U.S. at 303 (quoting 42 U.S.C. § 1396a).   There is "no categorical prohibition against reliance on state interests unrelated to the Medicaid program itself when a State is fashioning the particular

16

contours of its own program. It retains the 'considerable latitude' that characterizes optional participation in a jointly financed benefit program." *Pharm. Rsch. & Mfrs. of Am.*, 538 U.S. at 666.

Vermont has taken advantage of the various congressionally authorized features of the Medicaid program for the express purpose of improving the health of its residents. *See* Waiver, p. 10-11. Since implementing a managed care model in 2005 under its 1115 Waiver, Vermont has succeeded in reducing its uninsured population from 11.4 percent to approximately 2.7 percent. *See id*., p. 10. The managed care model has also eliminated the bias toward institutional care and offers cost-effective, community-based services. *See id*. Vermont's efforts to reform its healthcare delivery system for all residents continue with its efforts to develop value-based payment models, increase access to private insurance with assistance to lower-income individuals, improve access to primary care, improve care for individuals with chronic care needs, and allow beneficiaries a choice in community based long-term care services that are more cost effective than institutional options. *See id*., p. 11. All of these ends are well within the "considerable latitude" Congress has granted the states through the Medicaid Act. *See Pharm. Rsch. & Mfrs. of Am.*, 538 U.S. at 666.

These efforts are funded, to a significant degree, by Vermont's provider tax. Congress has clearly authorized States to raise revenue through such a tax. *See* 42 U.S.C. §1396b(w). Plaintiffs, located outside the state, are not subject to the provider tax and therefore do not assist Vermont in raising revenue that qualifies for matching FFP. In essence, to the extent that Vermont Medicaid beneficiaries choose to receive care at one of the out-of-state facilities, there is a corresponding financial loss to the State. Preserving the financial integrity of welfare programs is a legitimate state interest. *In re NYAHSA Litig*., 318 F. Supp. 2d at 42 (citing

*Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (discussing a state's broad discretion in financing Medicaid benefits)).

The inverse of this argument, from Plaintiffs' perspective, is that Plaintiffs do not pay Vermont's provider tax. As a result, they are relieved of a burden that in-state participating providers must bear. Stated this way, the rates at issue do not impose a burden on Plaintiffs as compared to in-state providers. To the contrary, Plaintiffs are relieved of one burden, the provider tax, and given another, the rates at issue. *Cf. Breckinridge Health v. Price*, 869 F.3d 442, 427 (6th Cir. 2017) (finding that different type of Medicaid payment to Kentucky hospitals was correctly viewed as offset of Kentucky provider tax). Thus, there is not an undue burden on interstate commerce at all.

Moreover, under these broad congressional statutory authorizations, Vermont's Waiver explicitly allows DVHA to set rates, either with individual providers, or with classes of providers. Waiver at art. 5. DVHA has done so in a manner it deems to be in the best interests of Vermont Medicaid beneficiaries. "When Congress has plainly and specifically delegated such power to the states, state regulations within the scope of that delegation are invulnerable to constitutional challenge." *Mid-Atl. Bldg. Sys. Council, a Div. of Pennsylvania Builders Ass'n, Inc. v. Frankel*, 17 F.3d 50, 52 (2d Cir. 1994) (citing *Northeast Bancorp, Inc. v. Board of Governors, Inc.*, 472 U.S. 159, 174 (1985); *White v. Massachusetts Council of Constr. Employers*, 460 U.S. 204, 213 (1983)).

In sum, the reimbursement rates of which Plaintiffs complain do not implicate dormant Commerce Clause concerns because Congress has clearly allowed states to develop their own health care programs, in terms of both delivery and financing. Further, Vermont's program does

not impose an undue burden on Plaintiffs given that they do not pay the provider tax.  Count II of the Complaint should be dismissed.

### III.     Count II Should Be Dismissed Because the State is a Market Participant Purchasing Plaintiffs' Health Care Services.

Even where Congress has not spoken, a State is not subject to the Dormant Commerce Clause when the State acts as a market participant rather than a regulator. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976) ("Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens."). A government entity acts as market participant when it "enters the open market as a buyer or seller on the same footing as private parties[.]" *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995).

Whether a state is acting as a market participant rather than a regulator is a threshold question. *White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 210 (1983). The relevant inquiry is "whether the challenged program constituted direct state participation in the market." *Reeves, Inc. v. State*, 447 U.S. 429, 435 n.7 (1980) (quotation omitted). Stated differently, where the state "impose[s] restrictions that reach beyond the immediate parties with which the government transacts business", it acts as a regulator rather than a market participant. *White*, 460 U.S. at 211 n.7; *see also South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 97 (1984) ("The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market.").

Here, like other state Medicaid program administrators, DVHA acts in the same manner as a private insurer when entering contracts with providers.  DVHA cannot force any provider to participate in Vermont's Medicaid program and must balance this limited authority with setting reimbursement rates to provide beneficiaries with appropriate care.  Further, Plaintiffs have not

alleged that Vermont Medicaid's purportedly discriminatory pricing scheme—paying lower rates to out-of-state hospitals—has any impact, or imposes any restrictions, beyond the hospitals with which the State contracts for health care services for Vermont Medicaid beneficiaries.

In a remarkably similar case, *Asante v. California Department of Health Care Services,* the Ninth Circuit determined that California Medicaid ("Medi-Cal") was exempt from a dormant Commerce Clause challenge to its differential reimbursements to out-of-state hospitals versus in-state hospitals because it acted much like a private insurer. 886 F.3d 795 (9th Cir. 2018). The Court noted that both beneficiaries and medical providers are voluntary participants. As with private insurance, beneficiaries are obligated to verify that their chosen hospital participates in Medi-Cal. The plaintiff hospitals can choose whether to participate as they see fit. To ensure an adequate provider network, Medi-Cal must set reimbursement rates in light of market pressures. The Court summed up its analysis as follows:

> [The California Department of Health Care Services] sets rates of reimbursement to hospitals for those who are essentially insured as beneficiaries under Medi-Cal in a manner much like that of a private insurer participating in the market. Like others in the market, no one is required to deal with the Department. The beneficiaries (insureds) who receive protection through the program voluntarily choose to participate. The state does not force it upon them by regulation or otherwise. More importantly, the Hospitals are not required to participate in the Medi-Cal insurance program; no hospital is. They may or may not, as they see fit. In fact, if a Medi-Cal beneficiary wishes to use the services of a hospital, it is incumbent upon that beneficiary to ascertain whether the hospital has chosen to participate in the program. Of course, that is the very sort of issue that is faced regularly by insureds in the private insurance market. Finally, lest there be doubt, we note that, like any other market participant, the Department is subject to market pressures and conditions. It must, indeed, set its payment rates at a level that is 'sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.' 42 U.S.C. § 1396a(a)(30)(A).

*Asante*, 886 F.3d at 801.

The same analysis applies here. Vermont Medicaid, much like a private insurer, is participating in the market for health care services provided by Plaintiffs. This is clear from each Plaintiff's identical agreement with the Department to provide services under Vermont Medicaid. *See* Exhibits D, E & F.[5] The agreement reads: "The purpose of this Agreement is for Department of Vermont Health Access (DVHA) and PROVIDER to contract for health care services to be provided to members in Vermont Medicaid." General Provider Agreement, Art. 1. The contract goes on to define PROVIDER—each Plaintiff here—as "an individual or entity that has . . . executed this Agreement in order to order, refer, prescribe and/or provide health care services to Vermont Medicaid members." *Id.* Art. 2.2. The health care services each Plaintiff provides to Vermont Medicaid members are no different from the health care services each Plaintiff provides to other consumers—individual patients or, more commonly, their private health insurance companies.

Like the plaintiffs in *Asante*, the out-of-state hospitals here are not obligated to participate in Vermont Medicaid. Plaintiffs entered agreements with the Department voluntarily, as a requirement of participating in Vermont Medicaid. 42 C.F.R. § 431.107 (requiring provider agreement "between the Medicaid agency and each provider or organization furnishing services under the [state Medicaid] plan"); *see also Alice Peck Day*, 2021 WL 736146, at *3 ("Had they not executed the Agreements, plaintiffs would have been ineligible to receive Medicaid reimbursement for services provided to Vermont Medicaid recipients."). Vermont Medicaid is

---

[5] The Court may consider these contracts in this motion to dismiss. *Libertarian Party*, 970 F.3d at 120. Moreover, the New Hampshire District Court relied on the forum selection clause in these contracts in ordering this case be transferred to this Court. In so doing, the New Hampshire District Court noted that: (1) the parties do not dispute the existence of the contracts, and (2) "[a]bsent the contractual relationship created by the [contracts], plaintiffs would have no rights under the Medicaid Plan and no standing to bring their claims. . . . [P]laintiffs' claims arise from the [contracts]." *Alice Peck Day*, 2021 WL 736146, at **3, 4.

subject to the same federal statutes and market pressures as Medi-Cal, including the requirement to "provide such methods and procedures relating to . . . the payment for care and services available under the plan . . . [as] are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). Clearly, Vermont Medicaid has accurately assessed the out-of-state price point sufficient to enlist a certain number of small New Hampshire hospitals such as Plaintiffs. Bluntly stated, this price is what the market allows Vermont Medicaid to pay Plaintiffs for their services.

To further confirm DVHA's actions are akin to a market-participant, Vermont's Waiver explicitly states that it shall operate as a managed care-like organization.  *See* Waiver, p. 11.  A Medicaid managed care organization is one kind of participant in the market for health care and can be either a public or private entity.  *See* 42 U.S.C. § 1396b(m) (defining Medicaid managed care organization).  DVHA is explicitly acting as such an organization—and participating in the market for health care accordingly—as authorized by federal statute, in Vermont's Waiver, and under the terms of its agreements with Plaintiffs.  The contracts between the parties are materially indistinguishable from what a private health insurer would require of a provider in its network.

The heavily regulated nature of the health care market, generally, does not preclude a State from acting as a market participant. For instance, Louisiana statutorily restricted its purchase of health insurance services for state employees to only Louisiana-based Health Maintenance Organizations (HMOs), defined as HMOs that performed certain administrative services within the state. The Fifth Circuit found that the market participant exception to the dormant Commerce Clause applied, because the definition of a Louisiana-based HMO

constituted "merely a definition of the State's preferred contracting partners." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 626 (5th Cir. 2010). The contracting requirements "appl[ied] only while the State, as a participant in the market for insurance contracts, 'retain[s] a continuing proprietary interest in the subject of the contract.'" *Id.* (quoting *South-Central Timber*, 467 U.S. at 96). Moreover, Louisiana's requirements did "not have a regulatory effect on a market downstream from the market in which the State participates. The only markets affected by the Act are those for services that the contracts explicitly require the insurance companies to perform[.]" *Id.*

Likewise, Vermont's hospital reimbursement rates have no regulatory effect on any market downstream from the market for health care services—services for which DVHA has contracted with Plaintiffs.  Vermont, through DVHA, is acting as a market participant for all allegations in the Complaint.  The dormant Commerce Clause therefore does not apply.

### Conclusion

For the foregoing reasons, this Court should dismiss Counts I and II and dismiss the State Defendants from this case.

DATED at Burlington, Vermont this 9th day of April 2021.

Respectfully submitted,

STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

*/s/ David McLean*
David McLean
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-1101
David.McLean@vermont.gov

*Counsel for Defendants Michael Smith and
Vermont Agency of Human Resources*