U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2022 MAR 22  PM 3: 20

CLERK

BY _____
    DEPUTY CLERK

ALICE PECK DAY MEMORIAL HOSPITAL; )
THE CHESIRE MEDICAL CENTER;           )
VALLEY REGIONAL HOSPITAL, INC.;       )
and LITTLETON HOSPITAL                )
ASSOCIATION, INC. d/b/a LITTLETON     )
REGIONAL HEALTHCARE,                  )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )     Case No. 2:21-cv-102
                                      )
MICHAEL SMITH, in his official capacity )
as the Secretary of the Vermont Agency of )
Human Services; STATE OF VERMONT      )
AGENCY OF HUMAN SERVICES;             )
GREEN MOUNTAIN CARE BOARD;            )
XAVIER BECERRA, in his official capacity )
as Secretary of the United States Department )
of Health and Human Services;         )
CHIQUITA BROOKS-LASURE, in her        )
official capacity as Administrator of the )
Centers for Medicare & Medicaid Services; )
and CENTERS FOR MEDICARE &            )
MEDICAID SERVICES,                    )
                                      )
          Defendants.                 )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE
STATE DEFENDANTS' MOTION TO DISMISS AND DENYING
GREEN MOUNTAIN CARE BOARD'S MOTION TO DISMISS**
(Docs. 23 & 50)

On July 20, 2021, Plaintiffs Alice Peck Day Memorial Hospital ("APD"), The

Cheshire Medical Center ("Cheshire"), Valley Regional Hospital, Inc. ("VRH"), and

Littleton Hospital Association, Inc. d/b/a Littleton Regional Healthcare ("LRH")

(collectively, "Plaintiffs") filed their First Amended Complaint ("FAC") seeking

declaratory and injunctive relief against Defendants Michael Smith, in his official

capacity as the Secretary of the State of Vermont Agency of Human Services ("AHS"), and AHS (collectively, the "State Defendants"); Green Mountain Care Board ("GMCB"); and Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), Chiquita Brooks-Lasure, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services ("CMS"), and CMS (collectively, the "Federal Defendants").

Plaintiffs are represented by Kierstan E. Schultz, Esq., Morgan C. Nighan, Esq., and W. Scott O'Connell, Esq. The State Defendants and GMCB are represented by David R. McLean, Esq. The Federal Defendants are represented by Assistant United States Attorney Jason M. Turner.

**I.    Procedural Background.**

On August 31, 2020, Plaintiffs filed their original Complaint in the District of New Hampshire.[1] On October 13, 2020, the State Defendants moved to transfer venue to the District of Vermont. Their motion was granted on February 25, 2021 and the case was transferred to this court. On April 9, 2021, the State Defendants moved to dismiss Counts I and II of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 23). While the motion to dismiss was pending, Plaintiffs moved to amend their Complaint on May 28, 2021, which this court granted on July 19, 2021, ruling it would consider the pending motion to dismiss in light of Plaintiffs' FAC.

The FAC, filed on July 20, 2021, (Doc. 34), alleges the following claims:

Count I: Violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (against the State Defendants and GMCB);

Count II: Violation of the Dormant Commerce Clause pursuant to 42 U.S.C. § 1983 (against the State Defendants and GMCB); and

Counts III-V: Violations of the Administrative Procedure Act ("the APA") pursuant to 5 U.S.C. § 706 (against the Federal Defendants).

---

[1] LRH was not a named plaintiff in the original Complaint, which also did not name GMCB as a defendant.

On September 1, 2021, Plaintiffs opposed the State Defendants' motion to dismiss (Doc. 39). The State Defendants replied on October 27, 2021 (Doc. 48), and Plaintiffs filed a sur-reply on November 30, 2021 (Doc. 63). Defendant GMCB filed a motion to dismiss on October 27, 2021 (Doc. 50).[2] On November 30, 2021, Plaintiffs opposed GMCB's motion (Doc. 62), and on December 30, 2021, GMCB replied (Doc. 66). Oral argument was held on January 7, 2022, at which time the court took the pending motions under advisement.

## II.    The FAC's Allegations.

### A.    Plaintiff Hospitals.

Vermont's Medicaid program "is administered through the Medicaid State Plan and certain federally-approved waivers[.]" (Doc. 34 at 23, ¶ 93.) Defendant AHS is "the single state agency designated to administer or supervise the administration of the Vermont Medicaid program under the Vermont Medicaid State Plan." *Id.* at 9, ¶ 26. The Department of Vermont Health Access ("DVHA") "is a division of AHS responsible for administering the Vermont Medicaid . . . program." *Id.*

Plaintiffs are hospitals located in the State of New Hampshire between five and twenty miles from the Vermont border that have provided medical services to Vermont Medicaid beneficiaries for decades. They contend that pursuant to Medicaid Section 1115(a) waivers obtained by Vermont, which permit the State to develop demonstration projects that promote Medicaid's objectives, Defendants have impermissibly created a Medicaid reimbursement scheme for out-of-state hospitals that is unconstitutional and violates the APA. They allege that "[b]ecause of [Vermont's] geography and location, more Vermont residents obtain out-of-state hospital services than residents of any other state." *Id.* at 2, ¶ 1 (citation omitted).

Plaintiffs participate in Vermont's Medicaid program, "incur similar costs and expend similar resources as Vermont's comparatively-sized" hospitals, *id.* at ¶ 2, and are

---

[2] GMCB's motion to dismiss is the same document as the State Defendants' reply (Docs. 48 & 50). Plaintiffs' opposition to GMCB's motion to dismiss is also the same document as its sur-reply to the State Defendants. (Docs. 62 & 63.)

"similarly situated to in-state Vermont hospitals with respect to the level of care and services they provide to Vermont Medicaid and uninsured patients and the volume of Vermont Medicaid and uninsured patients they treat." *Id.* at 3, ¶ 4. According to Plaintiffs:

> Under the Vermont State Medicaid Plan and Vermont law, and with the approval of the Federal Defendants, Defendant AHS, through its [DVHA] reimburses [Plaintiffs] for inpatient and outpatient hospital services rendered to Vermont Medicaid patients at significantly lesser rates than those paid to comparatively-sized and similarly-situated in-state Vermont hospitals[.]

(Doc. 34 at 3, ¶ 3.) Plaintiffs are allegedly reimbursed at these lower rates "solely because [they] are located . . . slightly beyond the Vermont border." *Id.*

Plaintiffs allege that "Defendants' actions in approving and setting the discriminatory rates" have caused them financial harm and "threaten a 'core' objective of Medicaid: the provision of medical coverage to the needy." *Id.* at ¶ 5. For example, Plaintiff LRH contends that its obstetrics program "loses nearly one million dollars per year from inadequate reimbursements," which may result in the closure of its program. *Id.*

### B. The Demonstration Waiver.

In 2005, the Federal Defendants first approved the Vermont Global Commitment to Health Medicaid Section 1115(a) Demonstration Waiver (the "Demonstration Waiver"), which "gives Vermont more flexibilit[y] in the way it uses its Medicaid resources." *Id.* at 14, ¶ 55. Vermont's goal in implementing the Demonstration Waiver was to "improve the health status of all Vermonters" by:

- Promoting delivery system reform through value based payment models and alignment across public payers;
- Increasing access to affordable and high quality health care by assisting lower-income individuals who can qualify for private insurance through the Marketplace;
- Improving access to primary care;
- Improving health care delivery for individuals with chronic care needs; and

4

- Allowing beneficiaries a choice in long-term services and supports and providing an array of home and community-based alternatives recognized to be more cost-effective than institutional based supports.

(Doc. 34-1 at 12-13.)

Pursuant to the Demonstration Waiver, DVHA was "converted from the state's Medicaid organization to a public Managed Care Organization[.]" (Doc. 34 at 14, ¶ 55.) "Starting [o]n January 1, 2011, [Defendant] CMS granted Vermont an extension of the Demonstration Waiver," which included a waiver permitting DVHA to establish rates with providers without regard to the rates set forth in the Vermont Medicaid State Plan. *Id.* at 15, ¶ 56.

In 2015, Defendant AHS "sought and obtained approval from the Federal Defendants for an extension of the existing . . . Demonstration Waiver." *Id.* at ¶ 59. "The goal for the extension was to align Vermont's Medicaid payments with other payers in furtherance of Vermont's novel [All-Payer Model]" ("APM"). *Id.* On October 24, 2016, Vermont received approval for a five-year extension of its Demonstration Waiver "in conjunction with its APM." *Id.* at 16, ¶ 62. This allowed for a "system of financing and delivering health care services facilitated by an Accountable Care Organization[ ]" ("ACO"). *Id.* at 4, ¶ 6.

Plaintiffs assert that "[a]fter the [October 2016] Demonstration Waiver [extension] was approved, Vermont amended its Medicaid State Plan to provide that, for inpatient services delivered on or after October 1, 2016, out-of-state hospitals would receive a base rate reimbursement of $2,900." (Doc. 34 at 17, ¶ 66.) They allege this rate is "approximately one-third of the base rate[ ] paid to" similarly situated hospitals in Vermont. *Id.* "Defendants Smith and AHS similarly improperly discriminate on the setting of so-called outlier Diagnosis Related Group . . . payments to out-of-state hospitals." *Id.* at 20, ¶ 76. According to Plaintiffs, "[w]hen the costs associated with providing inpatient services to a particular patient are atypically high and rise above a fixed-loss cost threshold amount (the 'fixed outlier value'), the treating hospital may qualify for 'outlier' payments under the Vermont State Medicaid Program." *Id.* at ¶ 77.

Plaintiffs contend that Vermont utilizes a discriminatory "fixed outlier value" and "reimbursement rate for outlier payments" to out-of-state hospitals. *Id.* at ¶¶ 78-79. "The State Plan was also amended to create disparate standards for outpatient services payments[.]" *Id.* at 17, ¶ 66 (citation omitted).

The applicable Demonstration Waiver states "[t]hese waivers are effective beginning January 1, 2017 and are limited to the extent necessary to achieve the objectives below." (Doc. 34 at 4, ¶ 9) (emphasis omitted). The provision titled "Payment to Providers" permits Vermont, as in past waivers, "to establish rates with providers on an individual or class basis without regard to the rates currently set forth in the approved State Plan." *Id.* at 5, ¶ 9 (citation omitted). Plaintiffs contend this provision is construed "as providing license and authority for eliminating any and all requirements related to methodologies or justifications for establishing the rates for out-of-state hospitals." *Id.* at ¶ 10. They assert that "a Secretary must adequately analyze any demonstration waiver's implications on any central objectives of the Medicaid Act." *Id.* at 6, ¶ 12. According to Plaintiffs, however, "Vermont never explained, and CMS never considered, the fact that Vermont would use the Demonstration Waiver to set up the discriminatory rate system they use today for in-state and out-of-state hospitals." *Id.* at 15, ¶ 57. "Further, none of the Defendants ever considered how such a discriminatory rate structure would implicate the 'core' objective of Medicaid[.]" *Id.*

## C.  GMCB.

In 2011, the Vermont legislature "created [Defendant] GMCB with the mission of improving 'the health of Vermonters through a high-quality, accessible, affordable, and sustainable health care system.'" (Doc. 34 at 15, ¶ 58.) GMCB is comprised of "an independent five-member Board whose members are appointed by the Governor for six-year terms." *Id.* at 10, ¶ 27. "Among other regulatory duties, [D]efendant GMCB is responsible for overseeing the development and implementation, and evaluating the effectiveness, of health care payment and delivery system reforms in Vermont." *Id.* at 15, ¶ 58. Its "regulatory authority includes provider rate-setting and oversight of [Vermont's]

6

all-payer claims database, and it also has authority over all Vermont acute care hospital revenue regardless of payer." *Id.*

### D.    The APM Agreement.

On October 27, 2016, Vermont's Governor, the Secretary of AHS, the Chair of GMCB, and CMS executed the Vermont All-Payer Accountable Care Model Agreement (the "APM Agreement"), which "sought to align Vermont's Medicaid with Medicare and commercial health care payers, through population-based payments to a single network of providers across all payers, using the same methodology." *Id.* at 16, ¶ 60. Plaintiffs assert that "[b]y enacting this unique payment model," Defendants Smith, AHS, and GMCB are "not acting merely as a market participant, but rather as both the regulator and market maker for health care services rendered to almost all Vermont residents that are covered by Medicare, Medicaid[,] and commercial insurance." *Id.* at 15-16, ¶ 59; 28-29, ¶ 112; 30 ¶ 122.

"In implementing APM . . . DVHA established a service agreement with OneCare [Vermont ("OneCare")], a single ACO that facilitates a provider network with population-based payment arrangements." (Doc. 34 at 9, ¶ 26.) Plaintiffs do not contract with OneCare, nor are they otherwise part of its network because "[g]iven their relatively low patient volume, it is financially unfeasible to engage in [the] population-based payment arrangement with APM." *Id.* at 10, ¶ 26.

Plaintiffs contend "[a]lthough a major goal of the APM Agreement is to limit health care cost growth in aggregate across all payers, including Medicaid, Defendants are improperly relying on the Waiver Authority [within the Demonstration Waiver] to underpay out-of-state hospitals that are not participating in the APM" but that deliver Medicaid-covered services to residents of Vermont. *Id.* at 4, ¶ 8. They point out that "[n]owhere in Vermont's Demonstration Waiver, [the] APM Agreement[,] or the Federal Defendants' approval are the drastically lower out-of-state reimbursement rates mentioned or analyzed for furthering a Medicaid core objective." *Id.* at 17, ¶ 64. In addition, "[n]othing in [the] discrete Waiver Authority authorizes Vermont to use different methodologies or practices to set reimbursement rates for in-state hospitals as

opposed to out-of-state hospitals" nor does it "authorize[ ] Vermont to shield from public inspection and comment the methodologies and justifications for setting rates." *Id.* at 23-24, ¶ 93.

> As a result, Plaintiffs allege that:

> [U]nder the Vermont State Medicaid Plan, as implemented through [the] Demonstration Waiver approved by Defendants Becerra, Brooks-LaSure, and CMS, and as administered and enforced by Defendants Smith and AHS, the Plaintiff Hospitals are each deprived of substantial reimbursement for inpatient and outpatient hospital services solely because they are not geographically located within Vermont, even though a large volume of Vermont Medicaid patients utilize and benefit from their proximity, convenience, and high quality of care.

*Id.* at 27, ¶ 103.

Plaintiffs assert that the Demonstration Waiver, as approved by the Federal Defendants, "is arbitrary and capricious in violation of 5 U.S.C. § 706 [of the APA] and must be vacated and set aside." (Doc. 34 at 5, ¶ 11.) They further assert that "[the State Defendants], with the approval of GMCB," construe the Demonstration Waiver in a manner that "permits them to engage in intentional discrimination against Plaintiff Hospitals in violation of the Equal Protection and Commerce Clauses of the United States Constitution and in violation of 42 C.F.R. § 431.52." *Id.*

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

8

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

## B.  Whether Defendants AHS and GMCB are Entitled to Eleventh Amendment Immunity.

Defendants AHS and GMCB assert they are "entitled to the protection of the Eleventh Amendment and/or Sovereign Immunity" because they are state agencies. (Doc. 50 at 12.) The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the text of the amendment speaks only of suits against a state by persons who are not citizens of that state, the Supreme Court has interpreted the Eleventh Amendment to extend to suits by all persons against a state in federal court." *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996). "It has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

"An action against a state official in his official capacity is deemed an action against the state itself, which possesses sovereign immunity under the Eleventh

Amendment[.]" *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (internal citations omitted). "The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). This is because "the officer is simply prohibited from doing an act which he had no legal right to do." *Ex parte Young*, 209 U.S. 123, 159 (1908).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (alteration in original)); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (holding that "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective") (internal quotation marks and citation omitted).

### 1.    AHS.

The State Defendants assert that Defendant AHS must be dismissed from this action, leaving Defendant Smith, in his official capacity, as the sole State Defendant. Plaintiffs respond that AHS is a proper Defendant because it allegedly waived its immunity and consented to suit through Provider Agreements between Plaintiffs and DVHA, a division of AHS, and "by voluntarily and vigorously litigating this suit for over a year[.]" (Doc. 62 at 8.)

Plaintiffs rely on *Feeney v. Port Auth. Trans-Hudson Corp.*, 873 F.2d 628 (2d Cir. 1989) for the proposition that, because their Provider Agreements with DVHA include a provision which states that "venue for legal actions" shall be in state or federal court in Vermont (Doc. 50-1 at 5), such "language justifies a waiver of sovereign immunity." (Doc. 62 at 9.) In *Feeney*, however, the Second Circuit concluded only that a "statutory

provision establishing 'venue' for suits against the Port Authority" constituted a waiver of the Eleventh Amendment based on the following statutory provision:

> venue in any suit, action or proceeding against the [P]ort [A]uthority shall be laid within a county or a judicial district, established by one of said states or by the United States, and situated wholly or partially within the port of New York district.

*Feeney*, 873 F.2d at 632-33 (citing N.Y. Unconsol. Laws § 7106 (McKinney 1979); N.J. Stat. Ann. § 32:1–162 (West 1963)) (alterations in original). Plaintiffs have not identified a similar statutory provision subjecting Defendant AHS to suit, nor have they cited a single case for the proposition that a contractual provision governing venue is tantamount to a waiver of sovereign immunity. A waiver of sovereign immunity requires "the most express language or . . . such overwhelming implications from the text as (will) leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (internal quotation marks and citation omitted). The choice of venue provision in the Provider Agreements fall far short of the express language required.

Plaintiffs' alternative argument that AHS voluntarily "consent[ed] to jurisdiction in federal court" through litigation conduct (Doc. 62 at 9-10) is based on the Supreme Court's holding in *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002) that "a State's voluntary appearance in federal court amounts to a waiver of its Eleventh Amendment immunity[.]" *Id.* at 613. The *Lapides* Court held that "[a] State waives its Eleventh Amendment immunity when it removes a case from state court to federal court." *Id.* There, "[the State] was brought involuntarily into the case as a defendant in state court, but it then voluntarily removed the case to federal court, thus voluntarily invoking that court's jurisdiction." *Id.* at 613-14. Plaintiffs do not contend this case was brought in state court and then removed to federal court by the State Defendants. Nor has AHS "unequivocally expressed" its consent to be sued by moving to transfer venue or filing the pending motion to dismiss. *Pennhurst*, 465 U.S. at 99 (citation omitted). AHS's filing of these motions does not, alone, constitute a waiver of sovereign immunity. *See Beckham v. Nat'l R.R. Passenger Corp.*, 569 F. Supp. 2d 542, 552 (D. Md. 2008) ("[A]n appearance before a federal court for the purpose of moving to transfer venue does not

constitute a waiver of Eleventh Amendment immunity.") "A State that abides by the [Federal Rules of Civil Procedure] by first filing a motion to transfer and then filing a subsequent motion in the transferee court raising several legal grounds for dismissal or summary judgment, including Eleventh Amendment immunity, should not be deemed to have voluntarily become a party to the case or to have submitted its rights for judicial determination." *Id.* at 554; *see also Kozaczek v. New York Higher Educ. Servs. Corp.*, 503 F. App'x. 60, 62 (2d Cir. 2012) (finding that a state agency did not waive Eleventh Amendment immunity by filing motions to dismiss).

As AHS has not waived its Eleventh Amendment immunity or consented to suit, it must be DISMISSED from this action. Counts I and II remain pending against Defendant Smith in his official capacity. *See Pennhurst*, 465 U.S. at 102.

### 2. GMCB.

Plaintiffs assert Defendant GMCB's "exact status is unclear at best[.]" (Doc 62 at 10.) They contend the court cannot determine on the current record whether GMCB is an arm of the State as opposed to a municipal corporation or quasi-governmental entity that is not entitled to Eleventh Amendment sovereign immunity. "Although the Eleventh Amendment does not apply to suits against counties, municipal corporations, and other political subdivisions, [an entity] is entitled to immunity if it can demonstrate that it is more like 'an arm of the State,' such as a state agency, than like 'a municipal corporation or other political subdivision.'" *Mancuso*, 86 F.3d at 292 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).

GMCB was created by a Vermont statute, 18 V.S.A. § 9372, which states that the Vermont Legislature's intent was to "to create an independent board to promote the general good of the State[.]" *Id.* It is not a part of AHS, 18 V.S.A. § 9374, 3 V.S.A. § 3002, and by GMCB's and the State Defendants' own admission, it "has broad duties with respect to [Vermont's] efforts to reform its healthcare system" and is "responsible for overseeing the development and implementation, and evaluating the effectiveness, of health care payment and delivery system reforms that are designed to control the rate of growth in health care costs and maintain health care quality in Vermont." (Doc. 50 at 6)

12

(internal quotation marks and citations omitted). In this capacity, GMCB "regulates hospitals' net patient revenue and fixed prospective payment growth and limits changes in their gross charges." *Id.* at 7 (citation omitted). GMCB oversees the issuance of certificates of need, *see In re ACTD LLC*, 2020 VT 89, ¶ 4, 250 A.3d 590, 593, and reviews and establishes state hospital budgets. 18 V.S.A. 9375(b). The FAC alleges that GMCB "approv[es]" the actions of the State Defendants and "administer[s] and enforce[s]" the Vermont State Medicaid Plan "as implemented through the Demonstration Waiver[.]" (Doc. 34 at 5, ¶¶ 10-11; 6, ¶ 15; 24, ¶ 97.) The State Defendants and GMCB contend that AHS has the "sole authority to set rates for Vermont Medicaid[,]" (Doc. 50 at 8) (citation omitted), and "[t]he [APM] Agreement explicitly carves out Medicaid as an area of the healthcare system that remains under the sole authority of AHS." *Id.* at 11.

Similar to Vermont state agencies, GMCB must "provide a process for soliciting public input" which "may include receiving written comments on proposed new or amended rules or holding public hearings, or both." 18 V.S.A. § 9378. It must also "ha[ve] access to data and analysis held by any [Vermont] Executive Branch agency which is necessary to carry out" its duties. 18 V.S.A. § 9379. Its members are "State employees[,]" 18 V.S.A. § 9374(a)(1), and thus Vermont has a duty to defend and indemnify them. *See* 3 V.S.A. § 1101, 12 V.S.A. § 5606. In addition, GMCB is treated as a "[p]ublic agency" under the Vermont's Public Records Act, 1 V.S.A. § 317(a)(2), and is treated as a "[p]ublic body" for purposes of Vermont's Open Meeting Law. 1 V.S.A. § 310(4).

The Second Circuit "routinely look[s] to state decisional law when . . . evaluat[ing] whether a governmental entity is entitled to sovereign immunity," such as whether a State's highest court has described the entity as a state agency. *Walker v. City of Waterbury*, 253 F. App'x. 58, 61 (2d Cir. 2007) (citations omitted). The Vermont Supreme Court has described GMCB's regulations as "state agency regulations[,]" thereby supporting a conclusion that GMCB is a Vermont state agency. *In re Confluence Behavioral Health, LLC*, 2017 VT 112, ¶ 28, 206 Vt. 302, 316, 180 A.3d 867, 877. It has

also evaluated issues related to GMCB's power regarding certificates of need against the backdrop of precedent that clarifies the "powers of an administrative agency[.]" *ACTD*, 2020 VT 89, ¶ 19, 250 A.3d 590, 597 (internal quotation marks and citation omitted). It has not, however, squarely addressed whether GMCB is an arm of the State.

In the Second Circuit, "two different tests [have been applied] to determine whether government entities are 'arms of the state' entitled to sovereign immunity under the Eleventh Amendment." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134-35 (2d Cir. 2015). In *Mancuso*, 86 F.3d at 293, the Second Circuit applied the following six-factor test:

(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Id.* "If these factors all point in one direction, then a court's inquiry is complete." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 240 (2d Cir. 2006). If, however, the *Mancuso* factors provide mixed results, the court must focus "on the twin reasons for the Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state treasury." *Id.* (citing *Mancuso,* 86 F.3d at 293). "If the outcome still remains in doubt, then whether a judgment against the governmental entity would be paid out of the state treasury generally determines the application of Eleventh Amendment immunity." *Id.* at 241.

In *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79 (2d Cir. 2004), the Second Circuit applied a similar test to "guide the determination of whether an institution is an arm of the state: (1) 'the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity,' and (2) 'the degree of supervision exercised by the state over the defendant entity.'" *Id.* at 82 (quoting *Pikulin v. CUNY*, 176 F.3d 598, 600 (2d Cir. 1999)).

In terms of which test the court should apply, the Second Circuit has clarified:

[A]s we have seen in our review of the cases, the tests have much in common, and the choice of test is rarely outcome-determinative. The *Clissuras* test incorporates four of the six *Mancuso* factors. To the extent that the *Clissuras* factors point in different directions, the additional factors from the *Mancuso* test can be instructive.

*Leitner*, 779 F.3d at 137.

The first *Clissuras* factor, the extent to which Vermont would be fiscally responsible for a judgment against GMCB, is "the most important factor in determining whether a state entity is entitled to sovereign immunity[.]" *Id.* GMCB receives funding through legislative appropriations, 18 V.S.A. § 9374(h), and its budget is included within the Vermont Governor's annual budget recommendations.[3] It, however, also receives funds from other sources including hospitals, medical service corporations, health insurance companies, health maintenance organizations, and accountable care organizations. 18 V.S.A. §§ 9374(h)(1)-(2)(A). Although "[r]eceipt of government funding is relevant in determining whether the state is responsible for judgments against a state entity[,]" this fact alone "is not sufficient to establish state responsibility for [GMCB's] financial obligations." *Leitner*, 779 F.3d at 138. GMCB does not cite any authority indicating that Vermont "would be responsible for satisfying a[] . . . judgment" entered against GMCB. *Clissuras*, 359 F.3d at 82; *see also Woods*, 466 F.3d at 250 (observing that "the state treasury is not obligated to pay directly any judgment against the Board [of Education] . . . [which] weighs against the Board's claim to be an arm of the state."). There is thus no certainty that a judgment against it would be paid by the "public fisc[.]" *S.J. v. Hamilton Cnty.,* 374 F.3d 416, 421, 423 (6th Cir. 2004) (explaining that while "values beyond guarding the public fisc play a role in the arm-of-the-state

---

[3] *See* Vermont Department of Finance & Management - Budget & Management Division, *FY 2022 State of Vermont Executive Budget Recommendation,* 1162-72,
https://finance.vermont.gov/sites/finance/files/documents/Budget/Budget_Recomm/FY_2022/FY 2022_Executive_Budget_Book%20_-_Amended_August%202021.pdf. The court "may take judicial notice of 'documents retrieved from official government websites,' or other 'relevant matters of public record[.]" *Jones v. Cuomo*, 542 F. Supp. 3d 207, 211 n.1 (S.D.N.Y. 2021) (internal citations omitted) (citing *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015); *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); and Fed. R. Evid. 201(b)).

inquiry . . . [its] precedents and the Supreme Court's case law still single out the factor of responsibility for a judgment as the most important (albeit not exclusive) determinant of arm-of-the-state status").

In terms of the second *Clissuras* factor, the degree of supervision Vermont exercises over GMCB, GMCB's members are nominated by a committee that consists of nine members appointed by Vermont's Governor, Senate, President Pro Tempore of the Senate, House of Representatives, and Speaker of the House of Representatives. *See* 18 V.S.A. § 9390(b). Each GMCB member is then appointed by Vermont's Governor, with the consent of the Senate, and may be removed for cause. 18 V.S.A. §§ 9391(c), 9374(b). Although Vermont's role in GMCB's appointment process weighs in favor of finding immunity, *see Walker*, 253 F. App'x. at 61 (holding that six of an entity's seven members appointed by state officials or elected in statewide elections constituted a "strong[] indicat[ion] that the [entity] is a state agency rather than an instrumentality of the City"), GMCB was created by statute to serve as an "independent board[.]" 18 V.S.A. § 9372. It thus remains unclear whether Vermont "has control over [GMCB's] day-to-day operations." *Leitner*, 779 F.3d at 139.

Although a close question, because the *Clissuras* factors may "point in different directions," *id.* at 137, determination of GMCB's sovereign immunity must await a factual record. *See Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2016 WL 7176586, at *14 (D. Vt. Dec. 7, 2016) ("At the pleading stage, dismissal of a novel claim without the benefit of . . . a factual record is not warranted") (citing *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979)).

For the reasons stated above, GMCB's motion to dismiss on the basis of Eleventh Amendment immunity must be DENIED WITHOUT PREJUDICE.

### C.   Whether Plaintiffs' Claims Must be Dismissed Because There is No Private Right of Action Under the Medicaid Act.

The State Defendants and GMCB assert that Plaintiffs' requests for relief must be denied "where they rest their Equal Protection and Commerce Clause claims on the requirements of 42 U.S.C. § 1396a[,]" which does not create a private right of action.

(Doc. 50 at 15.) In the FAC, Plaintiffs do not base their claims on § 1396, but instead assert violations pursuant to 42 U.S.C. § 1983. Under § 1983, they allege violations of the Equal Protection Clause (Count I) and the dormant Commerce Clause (Count II). The State Defendants' and GMCB's reliance on *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) is therefore misplaced. In *Armstrong*, the Supreme Court determined that the challenged provision of the Medicaid Act did not include a private right of action. *See id.* at 331-32. Here, Plaintiffs do not assert a direct challenge under the Medicaid Act. Dismissal for failure to allege a private cause of action must therefore be DENIED.

### D.      Whether Plaintiffs Plausibly Plead an Equal Protection Violation.

In Count I of the FAC, Plaintiffs allege that:

> Plaintiff Hospitals are similarly situated to comparable, in-state Vermont hospitals and provide comparable services; yet, for no reason rationally related to any legitimate state interest, Defendant Smith, in his official capacity, and Defendants AHS and GMCB continue to enforce against Plaintiff Hospitals [a] state law, regulation, or policy that violates Plaintiff Hospitals' Equal Protection rights under the Fourteenth Amendment to the United States Constitution. . . . Notably, Defendants' reliance on the Demonstration Waiver Authority to under pay out-of-state Plaintiff hospital providers has no rational connection to Vermont's implementation of the APM.

(Doc. 34 at 29, ¶¶ 113-14). The State Defendants and GMCB respond that Plaintiffs have not adequately pled they are similarly situated to in-state Vermont hospitals for purposes of asserting an equal protection claim and there is a rational basis for the disparity in the reimbursement rates.

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Plaintiffs' equal protection argument is not premised on a suspect classification but rather on the alleged discriminatory reimbursement rates for out-of-state hospitals.

> When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for

17

that different treatment. Such a claim, often referred to as a "class of one" equal protection claim, stems from the Equal Protection Clause's requirement that the government treat all similarly situated people alike.

*Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 49 (2d Cir. 2018) (citations omitted). For Plaintiffs to plausibly plead a "class of one" equal protection claim, they "'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Id.* (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). In other words, they "must be '*prima facie* identical' to the persons alleged to receive irrationally different treatment" because the "existence of highly similar circumstances can then provide an inference that the difference in treatment 'lack[s] any reasonable nexus with a legitimate governmental policy[.]'" *Id.* (citation omitted) (first alteration in original).

"When a statute or regulatory regime imposes different classifications or regulatory burdens on groups of regulated participants, rational basis review contemplates 'a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.'" *Id.* (quoting *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993)). "To withstand a motion to dismiss [a 'class of one' equal protection] claim, a plaintiff must plead sufficient facts that, treated as true, overcome the presumption of rationality that applies to government classifications." *Id.* at 49-50 (citation omitted). In making this determination, the court may consider any conceivable government purpose for a classification and is not limited to those identified by the parties. *See id.* at 50 (citing *Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 936 (5th Cir. 1988)) ("Going outside the complaint to hypothesize a purpose will not conflict with the requirement that, when reviewing a complaint dismissed under Rule 12(b)(6), we accept as true all well-pleaded facts.").

The FAC contends that Plaintiffs "treat Vermont Medicaid and uninsured patients of all acuity levels, and incur similar costs and expend similar resources as Vermont's comparatively-sized and similarly-situated in-state hospitals in order to provide care to

Vermont residents." (Doc. 34 at 2, ¶ 2.) It alleges that Plaintiffs offer "the [same] level of care and services" as their Vermont counterparts and treat the same or a similar volume of patients. *Id.* at 3, ¶ 4. The FAC contends that Plaintiffs are reimbursed "at significantly lesser rates than those paid to comparatively-sized and similarly-situated in-state Vermont hospitals—solely because APD, Cheshire, VRH, and LRH are located in New Hampshire, slightly beyond the Vermont border." *Id.* at 3, ¶ 3. More specifically, Plaintiffs assert they are reimbursed "at approximately one-third of the rates paid to in-state hospitals" despite the fact that they provide "identical services." *Id.* at 6, ¶ 13. At the pleading stage, Plaintiffs have adequately alleged sufficient similarity between themselves and in-state Vermont hospitals for purposes of this "fact-intensive inquiry." *See Clubside*, 468 F.3d at 159 (citation omitted).

The State Defendants and GMCB note that Plaintiffs do not pay Vermont's provider tax, which means "they do not contribute to the funding of Vermont's Medicaid program." (Doc. 50 at 26.) They conclude that this difference, alone, provides a rational basis for the allegedly discriminatory reimbursement rates, in addition to the other goals of the program related to "improv[ing] the health status of all Vermonters[.]" (Doc. 23 at 5.) The FAC, however, contends that the disparate reimbursement rates are "solely because" Plaintiffs are not located in Vermont (Doc. 34 at 3 ¶ 3), which threatens "diminish[ed] patient access to services." *Id.* at ¶ 5. As Plaintiffs point out, there is no correlation between the amount of Vermont's provider tax and the much larger differential between in-state and out-of-state reimbursement rates. Moreover, none of the operative documents contain this asserted rationale for the unequal treatment. Indeed, Vermont pays in-state reimbursement rates to Dartmouth-Hitchcock, a New Hampshire hospital, notwithstanding the fact that it does not pay Vermont's provider tax.

At this stage, Plaintiffs have alleged sufficient facts, accepted as true, to "overcome the presumption of rationality that applies to government classifications." *Progressive Credit Union*, 889 F.3d at 49-50; *see also Immaculate Heart Cent. Sch. v. New York State Pub. High Sch. Athletic Ass'n*, 797 F. Supp. 2d 204, 216 (N.D.N.Y. 2011)

(finding plaintiff overcame the presumption of rationality where the asserted facts,
accepted as true, "negate[d] defendants' explanation" of the challenged conduct).

In the context of a similar challenge to Vermont's reimbursement rates, the
District of New Hampshire ruled:

> Based on the information available at this early stage, even if a state has a
> legitimate interest in benefitting its own citizens with preferential Medicaid
> reimbursements and payments to in-state hospitals, Vermont's
> discriminatory scheme does not appear to be rationally related to that
> interest. Therefore, for purposes of [a] motion to dismiss, [plaintiff]
> sufficiently alleges that Vermont's reimbursement and payment scheme
> violates equal protection.

*Mary Hitchcock Mem'l Hosp. v. Cohen*, 2016 WL 1735818, at *11 (D.N.H. May 2,
2016). A similar conclusion is warranted here. As Plaintiffs point out, the disparity in
payment rates discourages out-of-state hospitals from treating Vermonters who receive
Medicaid and who seek non-emergency care close to their homes. This is contrary to
Vermont's purported objectives of "[i]ncreasing access to affordable and high quality
health care by assisting lower-income individuals[,]" "[i]mproving access to primary
care[,]" and "[i]mproving health care delivery for individuals with chronic care needs[.]"
(Doc. 34-1 at 12-13.)

Because, at the pleading stage, Plaintiffs plausibly allege an equal protection claim
based on Vermont's allegedly irrational and discriminatory Medicaid reimbursement
rates, dismissal of Count I is not warranted. *See Children's Seashore House v. Waldman*,
197 F.3d 654, 661-62 (3d Cir. 1999) (concluding hospital plaintiff's claim that denial of
benefits was based on its out-of-state location was sufficient to survive a motion to
dismiss on equal protection grounds); *W. Virginia Univ. Hosps., Inc. v. Rendell*, 2007 WL
3274409, at *7 (M.D. Pa. Nov. 5, 2007) (observing "[i]n the context of Medicaid
reimbursement, courts have struck down state payment schemes which discriminate
against out-of-state hospitals serving state residents" and holding that the denial of certain
payments to out-of-state hospitals failed rational basis review).

20

### E.   Whether the Market Participant Exception to the Dormant Commerce Clause Applies.

The State Defendants and GMCB seek dismissal of Count II of the FAC, which asserts a violation of the dormant Commerce Clause, because Vermont was acting as a market participant rather than a market regulator when establishing the challenged reimbursement rates for out-of-state hospitals. Plaintiffs respond that this fact-intensive inquiry should also await a factual record.

The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Although the Commerce Clause does not "expressly restrain the several States in any way, [the Supreme Court has] sensed a negative implication" within the Clause, "called the dormant Commerce Clause[.]" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008) (internal quotation marks omitted). It is "driven by concern about 'economic protectionism[;] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* at 337-38 (citation omitted). The point is to effectuat[e] the Framers' purpose to 'prevent a State from retreating into [the] economic isolation[] that had plagued relations among the Colonies and later among the States under the Articles of Confederation[.]" *Id.* at 338 (internal quotation marks and citations omitted).

Under the dormant Commerce Clause, courts ask whether the challenged law discriminates against interstate commerce. Where a challenged law discriminates against interstate commerce, it "will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives[.]'" *Id.* (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Ore.*, 511 U.S. 93, 94 (1994)). The court agrees with Plaintiffs that the State Defendants have thus far failed to sustain their "burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit the discrimination against interstate commerce[.]" *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992). However, when a State is acting as a market participant as opposed to a market regulator, its actions are exempt from the dormant Commerce Clause's

restrictions. *See Davis*, 553 U.S. at 339 ("an exception covers States that go beyond regulation and themselves 'participat[e] in the market' so as to 'exercis[e] the right to favor [their] own citizens over others'") (citation omitted). This is because "[t]here is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980) (citation omitted). A government entity acts as a market participant when it "enters the open market as a buyer or seller on the same footing as private parties[.]" *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995).

The parties dispute whether the Ninth Circuit's decision regarding the market participant exception in *Asante v. Cal. Dep't of Health Care Servs.*, 886 F.3d 795, 800-01 (9th Cir. 2018) is on point. In that case, plaintiff hospitals brought an action in state court against the California Department of Health Care Services and its Director challenging California's Medicaid reimbursement policies for out-of-state hospitals. *Id.* at 796. The action was removed to federal court, where the parties filed cross-motions for summary judgment. *Id.* at 799. The district court granted partial summary judgment in favor of plaintiff hospitals, holding that certain reimbursement policies regarding out-of-state hospitals violated the dormant Commerce Clause. *Id.* The Ninth Circuit reversed, holding that, because the state agency was acting as a market participant rather than a regulator with regard to its reimbursement methodology, it was exempt from a dormant Commerce Clause challenge. *Id.* at 802.

The Ninth Circuit explained that "activity is exempt under the market participant exception if it is a 'proprietary rather than regulatory activity' that may be 'analogized to the activity of' a private entity." *Id.* at 800-01 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 277-78 (1988)). In "drawing the line between regulators and market participants," it ruled that courts should "examine whether the state or local government has imposed restrictions that reach beyond the immediate parties with which the government transacts business." *Asante*, 886 F.3d at 801 (internal quotation marks and citation omitted). Reaching beyond the immediate parties indicates a State "is

22

seeking to regulate, not just participate in the market." *Id.* (citing *White v. Mass. Council of Constr. Emps., Inc.* 460 U.S. 204, 211 n.7 (1983)).

In terms of the challenged out-of-state hospital reimbursement scheme, the *Asante* court reasoned:

> Here the Department sets rates of reimbursement to hospitals for those who are essentially insured as beneficiaries under Medi-Cal in a manner much like that of a private insurer participating in the market. Like others in the market, no one is required to deal with the Department. The beneficiaries (insureds) who receive protection through the program voluntarily choose to participate. The state does not force it upon them by regulation or otherwise. More importantly, the Hospitals are not required to participate in the Medi-Cal insurance program; no hospital is. They may or may not, as they see fit. In fact, if a Medi-Cal beneficiary wishes to use the services of a hospital, it is incumbent upon that beneficiary to ascertain whether the hospital has chosen to participate in the program. Of course, that is the very sort of issue that is faced regularly by insureds in the private insurance market. Finally, lest there be doubt, we note that, like any other market participant, the Department is subject to market pressures and conditions. It must, indeed, set its payment rates at a level that is sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

*Id.* at 801 (internal quotation marks and citations omitted).

The Ninth Circuit analogized the facts in *Asante* to a milk-purchase plan instituted in Alaska whereby the State "dealt with the providers" but "did not engage in downstream regulation." *Id.* at 802 (citing *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 952 F.2d 1173, 1178-79 (9th Cir. 1992)). "[T]he fact that federal funds (and regulations) were involved made no real difference because that alone did not deprive the state 'of the market participant exception to the dormant commerce clause.'" *Id.* at 802 (quoting *Big Country Foods*, 952 F.2d at 1180). The Ninth Circuit noted that "the Medi-Cal program does not resemble a situation where a state has absolute monopoly over a resource and uses that monopoly to interfere with interstate commerce." *Id.* Ultimately, "if a hospital desires payment by others, it must follow the policies of the

entity paying them—whether that is the Department, or an insurance company, or another payor, or someone else." *Asante*, 886 F.3d at 802.

While *Asante* may prove instructive, it was decided on summary judgment with the benefit of a factual record and is not binding precedent. The State Defendants point out that the Demonstration Waiver states that DVHA operates "through a managed care-like model," (Doc. 34-1 at 13), however, they concede that "Vermont Hospitals are subject to regulation through [GMCB.]" (Doc. 23 at 13) (citation omitted). Moreover, unlike Medi-Cal, Vermont's unique health care system allegedly controls the payment structure for almost all market participants, which Plaintiffs contend renders Vermont a "centralized health care system that has eliminated any genuine private health care market" (Doc. 39 at 23), and which "resemble[s] a situation where a state has absolute monopoly over a resource and uses that monopoly to interfere with interstate commerce." *Asante*, 886 F.3d at 802 (citation omitted).

At this time, the court cannot conclude, as a matter of fact and law, that the market participant exception to the dormant Commerce Clause applies to Vermont's "unique" model. (Doc. 34 at 4, ¶ 6.) Defendants Smith, AHS, and GMCB are alleged to act as a "regulator and market maker for health care services[.]" *Id.* at 29, ¶ 112. Accepting these allegations as true, adjudication of Count II must await a factual record. The State Defendants' and GMCB's request for dismissal on market participant grounds is therefore DENIED WITHOUT PREJUDICE. *See Mary Hitchcock Mem'l Hosp.*, 2016 WL 1735818, at *7 (denying motion to dismiss where issues related to a dormant Commerce Clause challenge to Vermont's Medicaid reimbursement rates could be "addressed more comprehensively in the context of summary judgment").

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART the State Defendants' motion to dismiss (Doc. 23) and DENIES GMCB's motion to dismiss (Doc. 50).

SO ORDERED.

Dated this _22nd_ day of March, 2022.

Christina Reiss, District Judge
United States District Court