UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 MAR 22  PM 3: 20

CLERK
BY_____
DEPUTY CLERK

ALICE PECK DAY MEMORIAL HOSPITAL; )
THE CHESIRE MEDICAL CENTER; )
VALLEY REGIONAL HOSPITAL, INC.; )
and LITTLETON HOSPITAL )
ASSOCIATION, INC. d/b/a LITTLETON )
REGIONAL HEALTHCARE, )
)
    Plaintiffs, )
)
    v. ) Case No. 2:21-cv-102
)
MICHAEL SMITH, in his official capacity )
as the Secretary of the Vermont Agency of )
Human Services; STATE OF VERMONT )
AGENCY OF HUMAN SERVICES; )
GREEN MOUNTAIN CARE BOARD; )
XAVIER BECERRA, in his official capacity )
as Secretary of the United States Department )
of Health and Human Services; )
CHIQUITA BROOKS-LASURE, in her )
official capacity as Administrator of the )
Centers for Medicare & Medicaid Services; )
and CENTERS FOR MEDICARE & )
MEDICAID SERVICES, )
)
    Defendants. )

**OPINION AND ORDER GRANTING THE FEDERAL DEFENDANTS'
MOTION TO DISMISS**
(Doc. 22)

On July 20, 2021, Plaintiffs Alice Peck Day Memorial Hospital ("APD"), The Cheshire Medical Center ("Cheshire"), Valley Regional Hospital, Inc. ("VRH"), and Littleton Hospital Association, Inc. d/b/a Littleton Regional Healthcare ("LRH") (collectively, "Plaintiffs") filed their First Amended Complaint ("FAC") seeking declaratory and injunctive relief against Defendants Michael Smith, in his official capacity as the Secretary of the State of Vermont Agency of Human Services ("AHS"),

and AHS (collectively, the "State Defendants"); Green Mountain Care Board ("GMCB"); and Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), Chiquita Brooks-Lasure, in her official capacity as Administrator of the Centers for Medicare & Medicaid Services ("CMS"), and CMS (collectively, the "Federal Defendants").

Plaintiffs are represented by Kierstan E. Schultz, Esq., Morgan C. Nighan, Esq., and W. Scott O'Connell, Esq. The State Defendants and GMCB are represented by David R. McLean, Esq. The Federal Defendants are represented by Assistant United States Attorney Jason M. Turner.

## I. Procedural Background.

On August 31, 2020, Plaintiffs filed their original Complaint in the District of New Hampshire.[1] On October 13, 2020, the State Defendants moved to transfer venue to the District of Vermont. Their motion was granted on February 25, 2021 and the case was transferred to this court. On April 9, 2021, the Federal Defendants moved to Dismiss Counts III, IV, and V of the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and/or Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56(a) (Doc. 22). While the motion to dismiss was pending, Plaintiffs moved to amend their Complaint on May 28, 2021, which the court granted on July 19, 2021, ruling it would consider the pending motion to dismiss in light of Plaintiffs' FAC.

The FAC, filed on July 20, 2021, (Doc. 34), alleges the following claims:

Count I: Violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (against the State Defendants and GMCB);

Count II: Violation of the Dormant Commerce Clause pursuant to 42 U.S.C. § 1983 (against the State Defendants and GMCB); and

Count III-V: Violations of the Administrative Procedure Act (the "APA") pursuant to 5 U.S.C. § 706 (against the Federal Defendants).

---

[1] LRH was not a named plaintiff in the original Complaint, which also did not name GMCB as a defendant.

2

On September 1, 2021, Plaintiffs opposed the Federal Defendants' motion to dismiss (Doc. 39). The Federal Defendants replied on October 20, 2021 (Doc. 47), and Plaintiffs filed a sur-reply on November 4, 2021 (Doc. 56). Oral argument was held on January 7, 2022 at which time the court took the pending motion to dismiss under advisement.

## II. The FAC's Allegations.

### A. Plaintiff Hospitals.

Vermont's Medicaid program "is administered through the Medicaid State Plan and certain federally-approved waivers[.]" (Doc. 34 at 23, ¶ 93.) Defendant AHS is "the single state agency designated to administer or supervise the administration of the Vermont Medicaid program under the Vermont Medicaid State Plan." *Id.* at 9, ¶ 26. The Department of Vermont Health Access ("DVHA") "is a division of AHS responsible for administering the Vermont Medicaid . . . program." *Id.*

Plaintiffs are hospitals located in the State of New Hampshire between five and twenty miles from the Vermont border that have provided medical services to Vermont Medicaid beneficiaries for decades. They contend that pursuant to Medicaid Section 1115(a) waivers obtained by Vermont, which permit the State to develop demonstration projects that promote Medicaid's objectives, Defendants have impermissibly created a Medicaid reimbursement scheme for out-of-state hospitals that is unconstitutional and violates the APA. They allege that "[b]ecause of [Vermont's] geography and location, more Vermont residents obtain out-of-state hospital services than residents of any other state." *Id.* at 2, ¶ 1 (citation omitted).

Plaintiffs participate in Vermont's Medicaid program, "incur similar costs and expend similar resources as Vermont's comparatively-sized" hospitals, *id.* at ¶ 2, and are "similarly situated to in-state Vermont hospitals with respect to the level of care and services they provide to Vermont Medicaid and uninsured patients and the volume of Vermont Medicaid and uninsured patients they treat." *Id.* at 3, ¶ 4. According to Plaintiffs:

3

> Under the Vermont State Medicaid Plan and Vermont law, and with the approval of the Federal Defendants, Defendant AHS, through its [DVHA] reimburses [Plaintiffs] for inpatient and outpatient hospital services rendered to Vermont Medicaid patients at significantly lesser rates than those paid to comparatively-sized and similarly-situated in-state Vermont hospitals[.]

(Doc. 34 at 3, ¶ 3.) Plaintiffs are allegedly reimbursed at these lower rates "solely because [they] are located . . . slightly beyond the Vermont border." *Id.*

Plaintiffs allege that "Defendants' actions in approving and setting the discriminatory rates" have caused them financial harm and "threaten a 'core' objective of Medicaid: the provision of medical coverage to the needy." *Id.* at ¶ 5. For example, Plaintiff LRH contends that its obstetrics program "loses nearly one million dollars per year from inadequate reimbursements," which may result in the closure of its program. *Id.*

### B. The Demonstration Waiver.

In 2005, the Federal Defendants first approved the Vermont Global Commitment to Health Medicaid Section 1115(a) Demonstration Waiver (the "Demonstration Waiver"), which "gives Vermont more flexibilit[y] in the way it uses its Medicaid resources." *Id.* at 14, ¶ 55. Vermont's goal in implementing the Demonstration Waiver was to "improve the health status of all Vermonters" by:

- Promoting delivery system reform through value based payment models and alignment across public payers;
- Increasing access to affordable and high quality health care by assisting lower-income individuals who can qualify for private insurance through the Marketplace;
- Improving access to primary care;
- Improving health care delivery for individuals with chronic care needs; and
- Allowing beneficiaries a choice in long-term services and supports and providing an array of home and community-based alternatives recognized to be more cost-effective than institutional based supports.

(Doc. 34-1 at 12-13.)

Pursuant to the Demonstration Waiver, DVHA was "converted from the state's Medicaid organization to a public Managed Care Organization[.]" (Doc. 34 at 14, ¶ 55.)

4

"Starting [o]n January 1, 2011, [Defendant] CMS granted Vermont an extension of the Demonstration Waiver," which included a waiver permitting DVHA to establish rates with providers without regard to the rates set forth in the Vermont Medicaid State Plan. *Id.* at 15, ¶ 56.

In 2015, Defendant AHS "sought and obtained approval from the Federal Defendants for an extension of the existing . . . Demonstration Waiver." *Id.* at ¶ 59. "The goal for the extension was to align Vermont's Medicaid payments with other payers in furtherance of Vermont's novel [All-Payer Model]" ("APM"). *Id.* On October 24, 2016, Vermont received approval for a five-year extension of its Demonstration Waiver "in conjunction with its APM." *Id.* at 16, ¶ 62. This allowed for a "system of financing and delivering health care services facilitated by an Accountable Care Organization[ ]" ("ACO"). *Id.* at 4, ¶ 6.

Plaintiffs assert that "[a]fter the [October 2016] Demonstration Waiver [extension] was approved, Vermont amended its Medicaid State Plan to provide that, for inpatient services delivered on or after October 1, 2016, out-of-state hospitals would receive a base rate reimbursement of $2,900." (Doc. 34 at 17, ¶ 66.) They allege this rate is "approximately one-third of the base rate[ ] paid to" similarly situated hospitals in Vermont. *Id.* "Defendants Smith and AHS similarly improperly discriminate on the setting of so-called outlier Diagnosis Related Group . . . payments to out-of-state hospitals." *Id.* at 20, ¶ 76. According to Plaintiffs, "[w]hen the costs associated with providing inpatient services to a particular patient are atypically high and rise above a fixed-loss cost threshold amount (the 'fixed outlier value'), the treating hospital may qualify for 'outlier' payments under the Vermont State Medicaid Program." *Id.* at ¶ 77. Plaintiffs contend that Vermont utilizes a discriminatory "fixed outlier value" and "reimbursement rate for outlier payments" to out-of-state hospitals. *Id.* at ¶¶ 78-79. "The State Plan was also amended to create disparate standards for outpatient services payments[.]" *Id.* at 17, ¶ 66 (citation omitted).

The applicable Demonstration Waiver states "[t]hese waivers are effective beginning January 1, 2017 and are limited to the extent necessary to achieve the

objectives below." (Doc. 34 at 4, ¶ 9) (emphasis omitted). The provision titled "Payment to Providers" permits Vermont, as in past waivers, "to establish rates with providers on an individual or class basis without regard to the rates currently set forth in the approved State Plan." *Id.* at 5, ¶ 9 (citation omitted). Plaintiffs contend this provision is construed "as providing license and authority for eliminating any and all requirements related to methodologies or justifications for establishing the rates for out-of-state hospitals." *Id.* at ¶ 10. They assert that "a Secretary must adequately analyze any demonstration waiver's implications on any central objectives of the Medicaid Act." *Id.* at 6, ¶ 12. According to Plaintiffs, however, "Vermont never explained, and CMS never considered, the fact that Vermont would use the Demonstration Waiver to set up the discriminatory rate system they use today for in-state and out-of-state hospitals." *Id.* at 15, ¶ 57. "Further, none of the Defendants ever considered how such a discriminatory rate structure would implicate the 'core' objective of Medicaid[.]" *Id.*

### C. GMCB.

In 2011, the Vermont legislature "created [Defendant] GMCB with the mission of improving 'the health of Vermonters through a high-quality, accessible, affordable, and sustainable health care system.'" (Doc. 34 at 15, ¶ 58.) GMCB is comprised of "an independent five-member Board whose members are appointed by the Governor for six-year terms." *Id.* at 10, ¶ 27. "Among other regulatory duties, [D]efendant GMCB is responsible for overseeing the development and implementation, and evaluating the effectiveness, of health care payment and delivery system reforms in Vermont." *Id.* at 15, ¶ 58. Its "regulatory authority includes provider rate-setting and oversight of [Vermont's] all-payer claims database, and it also has authority over all Vermont acute care hospital revenue regardless of payer." *Id.*

### D. The APM Agreement.

On October 27, 2016, Vermont's Governor, the Secretary of AHS, the Chair of GMCB, and CMS executed the Vermont All-Payer Accountable Care Model Agreement (the "APM Agreement"), which "sought to align Vermont's Medicaid with Medicare and commercial health care payers, through population-based payments to a single network of

providers across all payers, using the same methodology." *Id.* at 16, ¶ 60. Plaintiffs assert that "[b]y enacting this unique payment model," Defendants Smith, AHS, and GMCB are "not acting merely as a market participant, but rather as both the regulator and market maker for health care services rendered to almost all Vermont residents that are covered by Medicare, Medicaid[,] and commercial insurance." *Id.* at 15-16, ¶ 59; 28-29, ¶ 112; 30 ¶ 122.

"In implementing APM . . . DVHA established a service agreement with OneCare [Vermont ("OneCare")], a single ACO that facilitates a provider network with population-based payment arrangements." (Doc. 34 at 9, ¶ 26.) Plaintiffs do not contract with OneCare, nor are they otherwise part of its network because "[g]iven their relatively low patient volume, it is financially unfeasible to engage in [the] population-based payment arrangement with APM." *Id.* at 10, ¶ 26.

Plaintiffs contend "[a]lthough a major goal of the APM Agreement is to limit health care cost growth in aggregate across all payers, including Medicaid, Defendants are improperly relying on the Waiver Authority [within the Demonstration Waiver] to underpay out-of-state hospitals that are not participating in the APM" but that deliver Medicaid-covered services to residents of Vermont. *Id.* at 4, ¶ 8. They point out that "[n]owhere in Vermont's Demonstration Waiver, [the] APM Agreement[,] or the Federal Defendants' approval are the drastically lower out-of-state reimbursement rates mentioned or analyzed for furthering a Medicaid core objective." *Id.* at 17, ¶ 64. In addition, "[n]othing in [the] discrete Waiver Authority authorizes Vermont to use different methodologies or practices to set reimbursement rates for in-state hospitals as opposed to out-of-state hospitals" nor does it "authorize[ ] Vermont to shield from public inspection and comment the methodologies and justifications for setting rates." *Id.* at 23-24, ¶ 93.

As a result, Plaintiffs allege that:

[U]nder the Vermont State Medicaid Plan, as implemented through [the] Demonstration Waiver approved by Defendants Becerra, Brooks-LaSure, and CMS, and as administered and enforced by Defendants Smith and AHS, the Plaintiff Hospitals are each deprived of substantial reimbursement

7

for inpatient and outpatient hospital services solely because they are not geographically located within Vermont, even though a large volume of Vermont Medicaid patients utilize and benefit from their proximity, convenience, and high quality of care.

*Id.* at 27, ¶ 103.

Plaintiffs assert that the Demonstration Waiver, as approved by the Federal Defendants, "is arbitrary and capricious in violation of 5 U.S.C. § 706 [of the APA] and must be vacated and set aside." (Doc. 34 at 5, ¶ 11.) They further assert that "[the State Defendants], with the approval of GMCB," construe the Demonstration Waiver in a manner that "permits them to engage in intentional discrimination against Plaintiff Hospitals in violation of the Equal Protection and Commerce Clauses of the United States Constitution and in violation of 42 C.F.R. § 431.52." *Id.*

### III. Conclusions of Law and Analysis.

#### A. Standard of Review.

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal quotation marks and citation omitted). "In resolving a motion to dismiss for lack of subject matter jurisdiction under [Fed. R. Civ. P.] 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Id.* "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The sufficiency of a complaint

under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted).

Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B. Whether Plaintiffs Have Standing to Sue the Federal Defendants.

"Standing is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of N.Y.*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal quotation marks, citations, alterations, and footnote omitted). To invoke the jurisdiction of the federal courts, Plaintiffs "must clearly allege facts demonstrating each element" of Article III standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration and internal quotation marks omitted). At the pleading

stage, standing is not "an onerous standard[,]" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016), and is a "relatively modest" burden. *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

In seeking dismissal of the FAC, the Federal Defendants argue that Plaintiffs are unable "to establish a causal connection between [Plaintiffs'] alleged injuries and any action by [the Federal Defendants]." (Doc. 47 at 2.) They note that while Plaintiffs' FAC has shifted its focus from the Vermont State Medicaid Plan to the Demonstration Waiver and APM Agreement, the Federal Defendants' actions "are still distant and attenuated from the rates set by Vermont[.]" *Id.* As they point out, Plaintiffs "fail to identify a single provision of the [Demonstration Waiver or APM Agreement] which authorizes the reimbursement structure of which they complain" because "Vermont establishes Medicaid reimbursement rates for in-state and out-of-state hospitals without seeking [the Federal Defendants'] approval[.]" *Id.* at 3-4, 6.

Plaintiffs respond that they have adequately alleged causation at the pleading stage because "the Federal Defendants approved the Waiver that contains language on which the State of Vermont has relied to set up its discriminatory rate scheme." (Doc. 56 at 5.) In doing so, they contend the Federal Defendants failed to consider how "the discriminatory rate structure that could follow from it . . . would impact the core objectives of Medicaid[.]" (Doc. 34 at 27, ¶ 104.) They argue that Vermont's actions fail to promote the Medicaid Act's objectives and the Demonstration Waiver makes this possible.

"[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party[.]" *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). "[I]ndirectness of injury, while not necessarily fatal to standing, may make it substantially more difficult to meet the minimum requirement of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 44-45 (internal quotation marks omitted). This is because the Supreme

Court has "refus[ed] to endorse standing theories that rest on speculation about the decisions of independent actors[.]" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (internal quotation marks and citation omitted).

However, "[w]hile . . . it does not suffice if the injury complained of is the result of the *independent* action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169 (internal quotation marks, alterations, and citations omitted) (emphasis in original); *see also Carter*, 822 F.3d at 55-56 (holding that "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing") (citation omitted).

Beyond approval of the Demonstration Waiver itself, which does not contain the challenged rates, Plaintiffs do not allege that the Federal Defendants have caused them any injury. The APM Agreement, to which CMS is a party, also does not contain the challenged rates. Plaintiffs concede the State Defendants independently established the challenged rates without seeking federal involvement or approval. Although they do not contend the Federal Defendants influenced, encouraged, or coerced the challenged rates, they ask the court to find that the Demonstration Waiver and the extensions of it allowed the State Defendants to engage in constitutional violations. These factual allegations, even viewed in the light most favorable to Plaintiffs, fail to establish standing. As the D.C. Circuit observed:

> Having outlined the alleged causal chain, we conclude that the connection between the beginning and end of the purported chain remains so attenuated that we cannot hold the alleged injury to be "fairly traceable to" the final agency rules "and not the result of the independent action" of the State of Illinois. Where "the necessary elements of causation and redressability . . . hinge on the independent choices of the regulated third party," i.e. the States, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." Appellants fall far short of carrying their burden.

*Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (alteration in original).

For standing purposes, "causation turns on the degree to which the [Federal Defendants'] actions constrained or influenced the decision of the final actor in the chain of causation." *Carver*, 621 F.3d at 226. Here, Plaintiffs admit that "*[n]owhere in Vermont's Demonstration Waiver, APM Agreement[,] or the Federal Defendants' approval are the drastically lower out-of-state reimbursement rates mentioned*[.]" (Doc. 34 at 17, ¶ 64) (emphasis supplied). The Federal Defendants' involvement was limited to approval of the Demonstration Waiver which authorized the State Defendants to act. The State Defendants then unilaterally set the alleged unconstitutional out-of-state rates without federal involvement, approval, coercion, or encouragement.

Analyzing the converse of what occurred illustrates the lack of a causal connection. Once the Demonstration Waiver was approved, Vermont could have opted to institute *higher* reimbursement rates for out-of-state hospitals had it chosen to do so. It could have justified those higher rates as an effort to attract hospitals in New Hampshire to furnish non-emergency Medicaid services to Vermonters who lived close to the Vermont-New Hampshire border and whose health care needs might not otherwise be adequately served. Federal approval of this approach also would not be required.

The court agrees with the Federal Defendants that *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26 (1976) is on point. There, the Supreme Court held the plaintiffs lacked standing to challenge an IRS Revenue Ruling which allowed favorable tax treatment to nonprofit hospitals which offered only emergency room services to indigent persons. The plaintiffs alleged the Revenue Ruling "'encouraged' hospitals to deny services to indigents." *Simon*, 426 U.S. at 42 (footnote omitted). In determining this causal relationship was insufficient, the Court explained:

> The complaint here alleged only that petitioners, by the adoption of [the IRS Revenue Ruling], had "encouraged" hospitals to deny services to indigents. The implicit corollary of this allegation is that a grant of respondents' requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would "discourage" hospitals from denying their services to respondents. But it does not follow from the allegation and its corollary that the denial of access to hospital services in fact results from petitioners' new Ruling, or

12

> that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire. It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' "encouragement" or instead result from decisions made by the hospitals without regard to the tax implications.

*Id.* at 42-43 (internal footnote omitted).

As in *Simon*, the Demonstration Waiver neither encourages nor discourages the challenged reimbursement rates. *See id.* at 42. Rather, it leaves it to the State Defendants to determine the appropriate rates. It thus "does not follow" that the allegedly discriminatory reimbursement scheme is caused by the Demonstration Waiver. *Id.* Nor have Plaintiffs identified how the challenged reimbursement rates are fairly traceable to any provision of the APM Agreement. The APM Agreement does not set Medicaid reimbursement rates for hospitals, nor does it differentiate between the reimbursement of in-state and out-of-state providers. Plaintiffs respond that *Simon* was decided "on summary judgment after adequate discovery[,]" (Doc. 56 at 3), but the Supreme Court held that the "District Court should have granted [the] motion to dismiss because respondents failed to establish their standing to bring this suit." *Simon*, 426 U.S. at 26.[2]

The alleged acts and omissions of the Federal Defendants, which empowered Vermont to make independent choices without further federal direction, influence, or approval, did not have a "determinative or coercive effect" on the challenged rates. *Carver*, 621 F.3d at 226 (internal quotation marks omitted); *see also Garelick v. Sullivan*, 987 F.2d 913, 920 (2d Cir. 1993) (determining that beneficiary plaintiffs lacked standing to challenge a scheme limiting physicians' charges for Medicare patients where "[a]ny

---

[2] Plaintiffs' reliance on *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) is similarly misplaced. In *Stewart*, the plaintiffs enrolled in Kentucky's Medicaid program brought an action against CMS and HHS challenging Section 1115 waivers, which the district court agreed were "subject to APA review." *Id.* at 256 (internal quotation marks and citations omitted). The waivers at issue, however, were ones HHS approved and included the challenged features of Kentucky's Medicaid program. In contrast, the Demonstration Waiver does not even address the challenged rates. (Doc. 34 at 17, ¶ 64.) For this same reason, *Gresham v. Azar*, 363 F. Supp. 3d 165 (D.D.C. 2019) is inapposite as that case also involved federal approval of the challenged provisions. *Id.* at 170-71.

13

increases in the amounts charged . . . would be the product of independent choices by physicians from among a range of economic options"); *Simpson v. Heckler*, 630 F. Supp. 736, 739 (E.D. Pa. 1986) (dismissing plaintiffs' complaint where the facts alleged did not support the conclusion that their injuries were fairly traceable to HHS's approval of a Medicaid program). Because Plaintiffs "have failed to carry th[eir] burden" of establishing that "the asserted injury was the consequence of the [Federal D]efendants' actions," *Simon*, 426 U.S at 45 (internal quotation marks omitted), they have failed to establish standing.

Even if Plaintiffs could establish that the challenged rates were not solely created by the independent actions of the State Defendants, they cannot establish redressability. If this court declared the Demonstration Waiver arbitrary and capricious, and vacated it on that basis, such a declaration would not result in Plaintiffs obtaining their desired rates. *See Lujan*, 504 U.S. at 561 (holding to have standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision") (citation and internal quotation marks omitted). It would merely require re-establishment of new rates, and the new rates that emerged from this administrative process are impossible to predict at this time. It is thus purely speculative whether Plaintiffs would ultimately obtain their desired outcome. *See Simon*, 426 U.S. at 45-46 (observing that there is no standing where "the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the [results] they desire").

Conversely, at oral argument, the State Defendants conceded that they could resolve Plaintiffs' challenge to the rates in question immediately through a negotiated settlement without the Federal Defendants' involvement or approval. This underscores the conclusion that Plaintiffs' claims will be redressed by the State Defendants' independent action alone. "The short of the matter is that redress of the only injury in fact respondents complain of requires action . . . by the [State Defendants]; and any relief the District Court could have provided in this suit against the [Federal Defendants is] not likely to produce that action." *Lujan*, 504 U.S. at 570-71.

For the reasons stated above, Plaintiffs have not established standing to bring their claims against the Federal Defendants. The Federal Defendants' motion to dismiss for lack of standing is therefore GRANTED. For this reason, the court does not evaluate the Federal Defendants' alternative arguments for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). *See O'Shea v. P.C. Richard & Son, LLC*, 2017 WL 3327602, at *7 n.2 (S.D.N.Y. Aug. 3, 2017) ("Because Plaintiffs lack Article III standing, this [c]ourt lacks subject-matter jurisdiction to adjudicate Defendants' 12(b)(6) motion."); *see also Carter*, 822 F.3d at 54-55 (determining that where dismissal is based on the absence of Article III standing the court is without jurisdiction and "lacks the power to adjudicate the merits of the case") (citation omitted).

## CONCLUSION

For the foregoing reasons, the court GRANTS the Federal Defendants' motion to dismiss Counts III-V of Plaintiffs' FAC (Doc. 22).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of March, 2022.

Christina Reiss, District Judge
United States District Court

15